Richard K. WILSON, Christine J. Wilson, Francis R. Caplan, E. Joyce Caplan, and The Karchmer Company, a Missouri general partnership, Plaintiffs–Appellants,

v.

AL McCORD INCORPORATED, an Oklahoma Corporation, Al McCord a/k/a L.A. McCord, and Rosemary McCord, Defendants–Appellees.

No. 85–2013.

United States Court of Appeals, Tenth Circuit.

Oct. 11, 1988.

Kirk D. Fredrickson, of Watson & McKenzie, Oklahoma City, Okl., for plaintiffs-appellants.

John T. Edwards, of Monnet, Hayes, Bullis, Thompson & Edwards, Oklahoma City, Okl., for defendants-appellees.

Before McKAY, SEYMOUR and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

Plaintiffs-appellants invested in an oil and gas drilling project in the Ringwood–Meno area of Oklahoma. They instituted this diversity action pursuant to 28 U.S.C. § 1332 in July 1982, seeking to rescind their purchase from defendants-appellees of undivided fractional working interests in two wells as violative of Okla.Stat. tit. 71, § 301 (1971), which provides:[1] "It is unlawful for any person to offer or sell any security in this state unless (1) it is registered under this act or (2) the security or transaction is exempted under Section 401."[2] Defendants acknowledged that the interests in the wells, the Emmons # 1 and Nichols # 1, were unregistered securities subject to the strictures of the Oklahoma Securities Act, Okla.Stat. tit. 71, §§ 1–504 (1971).[3] They maintained, however, that plaintiffs' claims were barred by the three-year statute of limitations contained in § 408(e) of the Act, or in the alternative, that the sales were exempt from registration under § 401(b)(15)A.

The district court agreed that the § 301 action on the Emmons # 1 well was time-

barred and entered summary judgment thereon for the defendants. The question of whether the sale of the working interests in the Nichols # 1 was entitled to exempt status was reserved for trial. At the conclusion of the evidence, the court directed a verdict for defendant Rosemary McCord, finding that she exercised no control over the transaction and therefore could not be held liable. The court then instructed the jury on the elements it deemed necessary to establish an exemption for the Nichols # 1 sale. The jury returned a verdict in favor of the remaining defendants. The court denied plaintiffs' post-trial motions and entered judgment on the verdict in March 1985.

On appeal, plaintiffs contend the district court erred in (1) allowing defendants' motion for summary judgment on the Emmons # 1 claim, (2) denying plaintiffs' motion for a new trial on the issue of Rosemary McCord's culpability, (3) denying plaintiffs' motion for judgment notwithstanding the verdict based upon defendants' failure to prove their entitlement to the registration exemption, and (4) denying plaintiffs' motion to reconsider the judgment in view of subsequent Oklahoma case law. Our jurisdiction to review these matters rests upon 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand.

## Background

Early in 1979, William Karchmer, a practicing attorney and a partner in the plaintiff Karchmer Co., approached Al Ellison, a client with substantial oil and gas investment experience, about the possibility of investing in a drilling venture. The Karchmer Co., an investment concern, recently

1. Plaintiffs also originally asserted claims under the anti-fraud provisions of the Oklahoma Securities Act, Okla.Stat. tit. 71, § 408(a)(2) (Supp. 1978), and the Securities Exchange Act, 15 U.S. C. § 78j(b), as well as for common law fraud. These claims are not before us.

2. Okla.Stat. tit. 71, § 408(a)(1) (Supp.1978) provides the remedy for a § 301 violation:
   (a) Any person who
      (1) offers or sells a security in violation of Title 71, Oklahoma Statutes, Sections 201(a), 301, or 404(b) ... is liable to the person

buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at ten percent (10%) per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security....

3. The term security under the act is defined to include any "interest in oil, gas, or mineral leases" with certain enumerated exceptions. Okla.Stat. tit. 71, § 2(20)(R) (Supp.1978).

had sold a sizable amount of property and sought to shelter some of the gain by investing in oil and gas ventures and deducting the intangible well drilling costs.

Although unaware of any opportunities at that time, Ellison later contacted Karchmer about a five-well drilling program in Major County, Oklahoma proposed by developer and defendant Al McCord. Ellison had business dealings with McCord since the early 1970's. McCord, a petroleum geologist, had formed defendant Al McCord, Inc. (AMI) in 1970 for the purpose of obtaining leases and developing wells. AMI was a family-owned business with McCord, its president, holding 51% of the outstanding stock and his wife, defendant Rosemary McCord, holding 49%. Both acted as directors along with a third unnamed party. Rosemary McCord also served as AMI's secretary, but had little influence over its daily operations.

Karchmer conferred with his business associate and brother-in-law, Jerome Caplan, who phoned McCord to request more information about the project. After reviewing the prospectus, Karchmer and Caplan, both of whom were experienced businessmen with some knowledge of the oil and gas industry, decided that the Karchmer Co. should invest in one of the five wells, the Emmons #1. On May 18, 1979, Jerome Caplan, in his capacity as a partner in the Karchmer Co., signed a letter of agreement for the purchase from AMI of a three-sixteenths working interest in the well.

In the meantime, Ellison had a conversation with plaintiff Richard Wilson in which the subject of McCord's project arose. Wilson, an attorney and long-time friend of Ellison, had invested in McCord's operations on at least three prior occasions. He likewise expressed a desire to minimize taxes and asked Ellison if any interests in the wells remained. Ellison indicated he would check with McCord. Shortly thereafter, Ellison gave Wilson the prospectus. Wilson signed a letter of agreement to purchase a one-eighth working interest in the Emmons #1 on May 13, 1979.

A third investor in the Emmons #1 well was plaintiff Francis Caplan. In the late winter of 1979, Jerome Caplan phoned his brother Francis to inquire whether he might be interested in the drilling program. Francis contacted McCord seeking further information. Francis Caplan studied the prospectus and on May 15, 1979, signed his letter of agreement for a one-sixteenth working interest.

The terms of the contracts required plaintiffs to pay 1.33% of the well's drilling and completion costs for each 1% of working interest acquired. This arrangement, commonly referred to in the oil and gas industry as a "third-for-a-quarter" deal, permitted AMI to retain a 25% carried interest, while selling 75% of the leasehold interest to plaintiffs and other investors in exchange for 100% of the drilling and completion costs. McCord testified that the carried interest was compensation for services rendered, including developing the lease, performing geological studies, securing the necessary contractors, employing workers and supervising the entire operation.

The initial reports on the Emmons #1 were favorable—so favorable that in the summer of 1979, the Karchmer Co., Richard Wilson and Francis Caplan elected to purchase like interests under identical terms in a second well known as the Nichols #1. The Karchmer Co. executed its agreement with AMI on July 19, 1979. Wilson and Caplan obtained their interests in the Nichols #1 on July 20 and 31 respectively, designating as named owners their plaintiff-wives, Christine Wilson and Joyce Caplan. Sometime after execution of the contracts, McCord assigned a 6.25% working interest in the Emmons #1 and Nichols #1 to Ellison as remuneration for his assistance in bringing the parties together.

Needless to say, what once appeared to be a promising investment turned out to be a dud. Neither the Emmons #1 nor the Nichols #1 produced as expected. Costs far surpassed returns. As a result, this lawsuit was commenced on July 19, 1982.

## I.

Plaintiffs first contend the district court improperly granted defendants' motion for summary judgment on plaintiffs' claim that the interests in the Emmons # 1 were unregistered securities in contravention of Oklahoma law. Fed.R.Civ.P. 56 mandates the entry of summary judgment only in the absence of a "genuine issue as to any material fact." *McKibben v. Chubb,* 840 F.2d 1525, 1528 (10th Cir.1988). The issue for our consideration is the trial judge's legal interpretation of state law to which we give some deference, but ultimately review *de novo.* *See Carter v. City of Salina,* 773 F.2d 251, 256–57 (10th Cir. 1985) (Seymour, J., concurring) (noting confusion in Tenth Circuit regarding amount of deference to be paid to district court's interpretation of state law).

The district court concluded that Okla. Stat. tit. 71, § 408(e) (1981), barred plaintiffs' request for rescission on their working interests in the Emmons # 1. Section 408(e) provides that no such action may be brought "more than three years after the sale." Sale is defined to include "every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value." Okla.Stat. tit. 71, § 2(13) (1981). Applying this law, the court, faced at the time with a question of first impression, held that because plaintiffs' executed the letters of agreement on the Emmons # 1 prior to July 19, 1979, over three years before filing their complaint, the cause of action was precluded. We agree.

Relying on the Illinois appellate court's decision in *Silverman v. Chicago Ramada Inn, Inc.,* 63 Ill.App.2d 96, 211 N.E.2d 596 (1965), plaintiffs assert that the sale was not consummated until they paid final completion costs on the well and received an assignment of their fractional working interests. *Silverman* admittedly stands for the proposition that the "sale" of a security continues until the purchasers remit final payment and receive the documents evidencing their interest. But we decline to follow it since we have contrary guidance from an Oklahoma appellate court.

We are persuaded by the Oklahoma Court of Appeals' decision in *Adams v. Smith,* 734 P.2d 843 (Okla.App.1986). *Adams,* decided after the notice of appeal was filed in this case, held that the sale of a fractional working interest in an oil well occurs under § 408(e) upon the execution of the letter agreement: "[I]t is clear that the rights of the parties were fixed at the time the letter agreements were signed. *Each individual letter agreement was a separate sale...."* *Adams,* 734 P.2d at 846 (emphasis added). The Oklahoma court rejected the idea that where a party makes several payments to obtain a security, the sale is "continuing." The court stated that "[t]he violation which commences the running of the statute must be the *first violation.* Otherwise, the statute of limitations would be rendered meaningless. This is particularly true where, as in the present case, the plaintiff has control over succeeding violations, i.e., by making further installment payments." *Adams,* 734 P.2d at 846 (emphasis in original) (quoting *Bryant v. Uland,* 327 F.Supp. 439, 447 (S.D.Tex.1971)).

In this instance, *Adams* instructs us that any violation of § 301 of the securities act accrued when the plaintiffs signed the letters of agreement. At that point, a sale of unregistered securities had occurred. Each party's rights and obligations were established. Nothing in the record indicates that defendants sought to conceal the registration status of the Emmons # 1 working interests, thereby possibly tolling the accrual of the action. Instead, neither party seemed concerned about the situation. Plaintiffs, among them knowledgeable attorneys and businessmen, could have inquired as to whether the securities were registered. They chose not to and cannot now cry foul.

In the absence of state supreme court authority, we *must* follow a state appellate court decision unless other rulings convince us the highest state court might find to the contrary. *O'Neil v. Great Plains Women's Clinic, Inc.,* 759 F.2d 787, 790 (10th Cir.1985). Here we are not convinced. The holding of *Adams*—that the statute of

limitations on a purported § 301 violation runs from the date the letters of agreement are signed—is sound and will be followed.

## II.

■ Plaintiffs next assert they are entitled under Fed.R.Civ.P. 59(a) to a new trial against defendant Rosemary McCord because the district court erred in directing a verdict in her favor at the close of all the evidence. In reviewing the propriety of a directed verdict pursuant to Fed.R.Civ.P. 50, we apply the same standard as the trial court should in the first instance. Viewing the evidence in a light most favorable to the nonmoving party, "a directed verdict is justified only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." *J.I. Case Credit Corp. v. Crites*, 851 F.2d 309, 311 (10th Cir.1988). Otherwise, the call is for the jury. *Grasmick v. Otis Elevator Co.*, 817 F.2d 88, 90 (10th Cir.1987).

■ Although the evidence that Rosemary McCord had no knowledge of AMI's activities, including the transactions at issue, was uncontroverted, plaintiffs alleged her liability as a controlling person under Okla.Stat. tit. 71, § 408(b) (Supp.1978), which provides:

Every person who materially participates or aids in a sale made by any person [in violation of § 301] . . . or who directly or indirectly controls any person so liable, shall also be liable jointly and severally with and to the same extent as the person so liable, unless the person who so participates, aids or controls sustains the burden of proof that he did not know, and could not have known, of the

existence of the facts by reason of which liability is alleged to exist. . . .

Plaintiffs' theory was that because Rosemary McCord served as a director, secretary, and 49% shareholder of AMI, she had a duty to oversee its operations. The trial judge, again without the benefit of any relevant Oklahoma case law interpreting the statute, concluded the indicia of her control were insufficient as a matter of law. We sustain him on this point as well.

This case is unlike our decision in *San Francisco–Oklahoma Petroleum Corp. v. Carstan Oil Co.*, 765 F.2d 962 (10th Cir. 1985). In *Carstan*, the plaintiff sought to rescind its purchase of a working interest in an oil well. We held that an individual was a controlling person under a comparable federal statute, 15 U.S.C. § 77o,[4] where he provided the money to organize the corporation, served as director and sole stockholder, signed the corporate reports, and appeared to occupy the position of one in charge. Moreover, because the defendant had actual knowledge of corporate transactions and how they were handled, he could not claim a lack of knowledge of the facts.

In contrast, Rosemary McCord testified without contradiction that she had no knowledge about AMI's activities: "My priorities [are] being a wife, a mother of three children, and I taught school for twenty years. And I feel like I don't know any more about his [Al McCord's] work than he would about school children that I taught." Rec. vol. III at 276. Besides, Rosemary McCord could not have controlled AMI even if she had so desired. Her main responsibility as secretary was to attest corporate documents by signing them. As only one of three directors and a minority

---

**4.** Section 15 of the Securities Act of 1933, codified as amended at 15 U.S.C. § 77o, states:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless

the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

Control is defined at 17 C.F.R. 230.405 as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." No definition of the term appears in the Oklahoma Securities Act.

stockholder, she did not direct corporate affairs. Al McCord held 51% of AMI's stock so that he alone could direct the activities of the corporation.

Plaintiffs failed as a matter of law to prove that Rosemary McCord was a controlling person within the meaning of Okla. Stat. tit. 71, § 408(b) (Supp.1978). *Cf. Durham v. Kelly,* 810 F.2d 1500, 1504 (9th Cir.1987) (to establish defendant as controlling person under federal law, plaintiff must show that she had actual influence and was a "culpable participant" in the alleged illegal activity). Even assuming *arguendo* that the remaining defendants are ultimately found to have violated § 301, as must occur before liability can be imposed under the language of § 408(b),[5] no reasonable jury could find Rosemary McCord culpable as a controlling person of AMI.

### III.

Lastly, plaintiffs maintain the defendants, Al McCord and AMI, did not establish that the sale of the Nichols # 1 working interests was entitled to a transactional exemption. Okla.Stat. tit. 71, § 401(b)(15)A. (Supp.1978), in force at the time of the sale, exempted the following from registration:

Any sale from or in this state to not more than thirty-two persons of a unit consisting of: interests in oil, gas or mining title(s) or lease(s) ... if

1. The seller above reasonably believes that all buyers are purchasing for investment;

2. No commission or other remuneration is paid or given directly or indirectly for the solicitation of any such sale excluding any commission or remuneration paid or given by and between parties each of whom is engaged in the business of exploring for or producing oil and gas or other valuable minerals;

3. No public advertising or public solicitation is used in any such solicitation or sale; and

4. Sales are effected only to persons the seller has reasonable cause to believe are capable of evaluating the risk of the prospective investment and able to bear the economic risk of the investment....

Section 401 provides an affirmative defense, and the burden of proving the exemption is on the defendant. Okla.Stat. tit. 71, § 401(e) (Supp.1978); *State v. Hoephner,* 574 P.2d 1079, 1081 (Okla.Cr.1978). Before a sale of an interest in oil and gas will be considered exempt from registration, each of the statute's four enumerated conditions must be proven. *Lambrecht v. Bartlett,* 656 P.2d 269, 272 (Okla.1982).

### A.

At the conclusion of the trial, plaintiffs unsuccessfully moved pursuant to Fed.R.Civ.P. 50 for a judgment notwithstanding the verdict. Plaintiffs argued that the evidence was insufficient to support the jury's finding that Al McCord reasonably believed the plaintiffs (1) were purchasing their interests in the Nichols # 1 for investment, and (2) were capable of evaluating and bearing the risks involved. In reviewing the denial of a motion for judgment n.o.v. based on the insufficiency of the evidence, we consider the evidence and all reasonable inferences to be drawn from it most favorably to the nonmoving party. *Suggs v. State Farm Fire & Casualty Co.,* 833 F.2d 883, 887 (10th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1732, 100 L.Ed.2d 196 (1988). "[S]ince the grant of such a motion deprives the non-moving party of the determination of the facts by a jury, judgment notwithstanding the verdict should be cautiously and sparingly granted." *Western Plains Serv. Corp. v. Ponderosa Dev. Corp.,* 769 F.2d 654, 656 (10th Cir.1985) (quoting *Joyce v. Atlantic Richfield Co.,* 651 F.2d 676, 680 (10th Cir. 1981)). A judgment n.o.v. is proper only where the evidence so favors the moving party that a reasonable jury could not find to the contrary. *Equal Employment Opportunity Comm'n v. Prudential Fed.*

---

**5.** *See Nikkel v. Stifel, Nicolaus & Co., Inc.,* 542 P.2d 1305 (Okla.1975) (liability of person making the sale is a prerequisite for a controlling person's liability under § 408(b)).

*Sav. & Loan Ass'n,* 763 F.2d 1166, 1171 (10th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985). "The philosophy of this doctrine is that there must be a minimum of interference with the jury." *Yazzie v. Sullivent,* 561 F.2d 183, 188 (10th Cir.1977). Applying this standard, we assent to the district court's denial of the motion.

In *Cowles v. Dow Keith Oil & Gas, Inc.,* 752 F.2d 508 (10th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 74, 93 L.Ed.2d 30 (1986), a panel of this court upheld a trial judge's finding under Fed.R.Civ.P. 52(a) that the evidence was sufficient to satisfy subsections 1 and 4 of § 401(b)(15)A. In that case, the investors initially contacted the developer seeking to invest, and the developer had "an indication" of the investors' financial stability. The panel majority concluded "the Cowles were not the persons in need of the protections of the Securities Acts" despite evidence that they had no knowledge of the oil and gas industry and never received any geological data before purchasing their interests in the wells. *Cowles,* 752 F.2d at 511–12. The dissenting panel member argued the evidence on which the majority relied was insufficient as a matter of law to carry the defendant's burden on the claimed exemption. *Cowles,* 752 F.2d at 514 (McKay, J., dissenting).

In this case, the evidence before the trier of fact regarding what the defendants might have reasonably believed about the plaintiffs' motives and capabilities is more substantial. On the question of whether the defendants could have understood the plaintiffs to be purchasing for investment purposes, the jury, weighing all the evidence, reasonably could find as it did. Plaintiffs do not appear to have intended to resell any portion of their working interests in the Nichols # 1. For instance, Al McCord knew the Karchmer Co. sought a tax shelter for investment. Rec. vol. III at 143. Richard Wilson, who had invested in AMI's projects on prior occasions, similarly sought the advantage of a tax shelter in this instance. Rec. vol. III at 84, 86–87, 137–38. McCord reasonably could have inferred from their telephone conversation that Francis Caplan was desirous of pur-

chasing a working interest for investment. *See* rec. vol. III at 240–41.

Likewise, the record reflects an adequate basis for the jury's determination that the defendants had reasonable cause to believe the plaintiffs were capable of evaluating and bearing the risks involved in the oil and gas venture. As in *Cowles,* the plaintiffs, either directly or through Al Ellison, initiated contact with the developer. But the analogy there ends. Unlike *Cowles,* the plaintiffs here all received a detailed prospectus discussing the geological aspects of the prospect, the terms of the proposed agreements, and the financial forecast for the wells. Richard Wilson, William Karchmer and Jerome Caplan had invested in oil and gas undertakings previously. Rec. vol. III at 30–32, 202, 255. Furthermore, McCord asked Ellison about the potential investors and their financial status. Rec. vol. III at 331. He was told they were successful businessmen who paid their bills. Rec. vol. III at 330–31. McCord had no reason to believe the plaintiffs were not capable of evaluating the risk.

■ Plaintiffs contend a judgment in their favor is proper because defendants failed to proffer any evidence concerning McCord's knowledge of the investment sophistication of Christine Wilson and Joyce Caplan. As noted, Richard Wilson and Francis Caplan took title to their working interests in the Nichols # 1 in the names of their respective spouses. If we were to accept plaintiffs argument that Christine Wilson and Joyce Caplan were "investors" entitled to the protections of the Oklahoma Securities Act, however, the path would be laid for every sophisticated investor to purchase unregistered securities, transfer them to an unknowing spouse, and speculate at the expense of the honest developer. We decline to elevate form over substance.

The evidence regarding what defendants believed about the plaintiffs was undoubtedly for the jury to evaluate. The jury weighed the evidence, considered the credibility of witnesses, drew reasonable infer-

ences, and reached a rational conclusion. Its decision cannot be set aside.

### B.

■ In their motion for judgment notwithstanding the verdict, the plaintiffs also quarreled with the district court's interpretation of § 401(b)(15)A.2. That subsection provides: "No commission or other remuneration [may be] paid or given directly or indirectly for the solicitation of any such sale *excluding* any commission or remuneration paid or given by and between parties each of whom is engaged in the business of exploring for or producing oil and gas...." (emphasis added). The defendants did not deny that the 6.25% working interest which McCord gave to Ellison in exchange for his solicitations was a commission, but instead asserted the applicability of the stated exclusion. Relying on the statute's plain meaning, the district court agreed with the defendants' assessment in a published opinion. *Wilson v. Al McCord Inc.*, 611 F.Supp. 621 (W.D.Okla.1985). Plaintiffs contend the trial judge's construction disregards legislative intent and is in error. Our review of an interpretation of state law is *de novo. Carter*, 773 F.2d 256–57 (Seymour, J., concurring).

This is yet another question of first impression. The district court correctly recognized that its resolution is governed by established canons of statutory construction: "In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of a 'clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *Colorado High School Activities Ass'n v. National Football League*, 711 F.2d 943, 945 (10th Cir.1983) (quoting *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)); *accord Allgood v. Allgood*, 626 P.2d 1323, 1327 (Okla.1981) ("A court is not justified in ignoring the plain words of a statute").

Given the evidence produced at trial, the jury could properly find that Al Ellison and Al McCord were "engaged in the business of exploring for or producing oil and gas."

*See Pic Oil Co., Inc. v. Grisham*, 702 P.2d 28, 31 (Okla.1985) (determination as to whether person is engaged in business is question of fact). Plaintiffs do not vigorously contest this point. Thus, the commission was "paid or given by and between parties" in the oil and gas business. We reject plaintiffs contention that the exclusionary language of subsection 2 is ambiguous.

■ Plaintiffs describe the scenario the Oklahoma legislature supposedly had in mind when enacting the law and ask us to give effect to its intent. We need not detail plaintiffs' arguments for they refer us to no legislative history to support their position. Because Oklahoma legislative history does not include debates, committee reports, or other documentation necessary to shed light on a statute's underlying purpose, *see State ex rel. Cartwright v. Georgia–Pacific Corp.*, 663 P.2d 718, 723 (Okla. 1982), we agree with the district court's conclusion that the defendants were entitled to rely on the provision's apparent meaning. Absent an unequivocal legislative intent reflected in published legislative history, or Oklahoma case law to the contrary, we must look to the words of a statute as the primary indicator of legislative intent. *Miller v. Commissioner of Internal Revenue*, 836 F.2d 1274, 1282–85 (10th Cir.1988).

### C.

■ Following denial of their Rule 50 motion, the plaintiffs filed a motion to reconsider. Relying on the Oklahoma Supreme Court's subsequent decision in *Pic Oil Co., Inc. v. Grisham*, 702 P.2d 28 (Okla.1985), they claimed that the 25% carried interest which defendants retained constituted "other remuneration" furnished McCord. In *Pic Oil*, outside investors in oil leases paid on a 7.2 to 1 ratio for their working interests as compared to the outlay of the developer for its carried interest. The court held as a matter of law that the developer had received "other remuneration" for the solicitation of the sale in con-

travention of § 401(b)(15)A.2.[6] Without commenting upon the law, the district court denied the motion.

We initially note that the Federal Rules of Civil Procedure do not provide a party subject to an adverse judgment the right to file the obligatory "motion to reconsider." *See F/H Indus., Inc. v. National Union Fire Ins. Co.*, 116 F.R.D. 224, 225 (N.D.Ill. 1987). Instead, the rules mandate that the aggrieved party, depending on the timing, file either a Rule 59 motion to alter or amend the judgment or a Rule 60 motion to vacate the judgment. Because more than ten days had elapsed before the filing of the motion to reconsider, *see* Fed.R.Civ.P. 59(e), we construe it as a motion pursuant to Fed.R.Civ.P. 60(b)(6): "[T]he court may relieve a party ... from a final judgment ... for the following reasons ... (6) any other reason justifying relief from the operation of the judgment."

We have recognized that in a diversity action Rule 60(b)(6) is the proper means by which to bring a change in the applicable state law subsequent to entry of final judgment to our attention. *Pierce v. Cook & Co., Inc.*, 518 F.2d 720, 722–23 (10th Cir. 1975) (en banc), *cert. denied*, 423 U.S. 1079, 96 S.Ct. 866, 47 L.Ed.2d 89 (1976). And although the standard of review on a Rule 60(b) motion is an abuse of discretion, *Republic Resources Corp. v. ISI Petroleum West Caddo Drilling Program*, 836 F.2d 462, 465 (10th Cir.1987), we have stated that "it is the duty of the Federal court that still has jurisdiction of the case to conform its decision and judgment to the latest decision of the supreme court of the state." *Robinson v. Volkswagen of America, Inc.*, 803 F.2d 572, 574 (10th Cir.1986) (quoting *Delano v. Kitch*, 663 F.2d 990, 996 (10th Cir.1981)).

The district court originally erred in declining to apply *Pic Oil*. In *Pic Oil*, the developer had made a capital investment in its drilling program, albeit a small one compared to that of outside investors, for a retained leasehold interest greater than the combined interests of other investors. The court concluded that the disproportionate price paid for the working interests by the respective parties resulted in the developer's receipt of "remuneration." Therefore, the offering did not qualify for an exemption under § 401(b)(15)A. Because the defendants in this case retained a 25% carried interest at no capital outlay, *Pic Oil* would seem to require judgment for the plaintiffs.

But *Pic Oil* is not the end of the story. During the pendency of this appeal, the Oklahoma Supreme Court decided *Mayfield v. H.B. Oil & Gas*, 745 P.2d 732 (Okla. 1987), on facts indistinguishable from the case at bar. *Mayfield* retreated from the holding in *Pic Oil* and held that whether the developer's 25% carried interest in a "third-for-a-quarter" deal constituted remuneration was a question of fact for the jury. To reach its conclusion, the court relied on the Oklahoma Securities Commission's Administrative Rule 410(a)(1). It provides that the carried interest cannot exceed an amount which is reasonable and customary under the circumstances:

> Under this rule, the Court must look at this transaction and determine whether the working interest retained exceeded a reasonable fee for the services actually performed.
>
> It is quite possible that the 25% working interest retained by the issuer at no capital outlay had the effect of diluting the investors' funds. As such, the carried interest could constitute a direct or indirect commission or other remuneration for the sale of securities and if so the sale would not qualify for the limited offering exemption....
>
> The issuer correctly argues however that it was error for the trial court to grant summary judgment because the question of whether the carried working interests were a commission or other remuneration was a question of fact that should have been submitted to the jury.

*Mayfield*, 745 P.2d at 735.

At trial, Al McCord briefly described the services that AMI furnished in exchange for the 25% carried interest. Rec. vol. III

---

6. In 1984, the Oklahoma legislature deleted the phrase "other remuneration" from § 401(b)(15)A.2. Okla.Stat. tit. 71, § 401(b)(15)A.2. (Supp.1984).

at 331–32. Without the benefit of *Mayfield,* however, the parties quite possibly did not develop the record on this point. The absence of guiding case law is equally reflected in the district court's charge to the jury on § 401(b)(15)A.2: "To establish this affirmative defense, the Defendants must prove by a preponderance of the evidence the following elements.... 2. That the *Defendants did not pay or give,* directly or indirectly, any commission or remuneration for the solicitation of the sales made to Plaintiffs...." Rec. vol. III at 384–85 (emphasis added). This instruction is incomplete in that it fails to inform the jury that it must also decide whether the 25% working interest *retained* by the defendants constituted a commission or remuneration within the meaning of subsection 2, or a reasonable fee for the services actually performed.

Accordingly, we must remand for a new trial, against the remaining defendants, on plaintiffs' claim that the sale of the Nichols #1 working interests violated Okla.Stat. tit. 71, § 301 (1971).

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.