PROFESSIONAL SERVICE
INDUSTRIES, INC.,
Plaintiff,

v.

W. David KIMBRELL and Janet
Kimbrell, Defendants.

Civ. A. No. 90–1326–MLB.

United States District Court,
D. Kansas.

Sept. 8, 1993.

**1292**

William A. Bonwell, Jr., Susan Ellis, Bonwell, Foster, Borniger & Ellis; William R. Smith, Hershberger, Patterson, Jones & Roth; David E. Bengtson, Morrison & Hecker, Wichita, KS; and Christopher L. Vescovo, John J. Thomason, Jerry E. Mitchell and Buckner P. Wellford, Thomason, Hendrix, Harvey, Johnson & Mitchell, Memphis, TN, for plaintiff/counter defendant and third-party defendants.

Paul L. Thomas, Wichita, KS, John J. Jurcyk, Jr., McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, John D. Petersen, Polsinelli, White, Vardeman & Shalton, Overland Park, KS, and Dennis J. Dobbels and David A. Welte, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, for defendant/counterclaimants and third-party plaintiffs.

Barbara K. Huff, Lawrence, KS, for objector.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on Kimbrells' motion for partial summary judgment. (Doc. 234) The motion seeks summary judgment on Professional Service Industries,

Inc.'s (PSI) claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.-10(b)(5), as well for fraud under state common law.[1]

David and Janet Kimbrell were the majority stockholders[2] of Hall–Kimbrell Environmental Services, Inc. (Hall–Kimbrell), an environmental engineering corporation headquartered in Lawrence, Kansas. Hall–Kimbrell provides services, *inter alia*, for the inspection, testing, and removal of asbestos from buildings.[3] PSI approached David Kimbrell in the fall of 1989 about the possibility of PSI purchasing the stock of Hall–Kimbrell. Negotiations ensued and the parties ultimately executed a stock purchase agreement on December 29, 1989, whereby the Kimbrells, along with the other shareholders of Hall–Kimbrell, sold their stock to PSI.

Commencing in March, 1990, the Environmental Protection Agency (EPA) filed numerous complaints against Hall–Kimbrell. The complaints centered on Hall–Kimbrell's failure to inspect wallboard for asbestos in schoolbuildings it had contracted to inspect.

PSI filed suit against David and Janet Kimbrell on July 5, 1990, alleging violations of § 12(2) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and assorted common law claims including fraud and breach of contract.[4] The court will provide additional factual background in the course of its discussion.

*Standards for Summary Judgment*

■ Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

1. Kimbrells also have moved for summary judgment on PSI's common law claims. (Doc. 475) By a separate Memorandum and Order, (Doc. 511), the court granted that motion.

2. David and Janet Kimbrell collectively owned approximately 80% of the stock of Hall–Kimbrell, Inc. at the time they sold their stock to PSI.

3. Hall–Kimbrell derived approximately 97% of its revenues from its asbestos business in 1988.

Of this amount approximately 40% was attributable to services provided to public schools seeking to comply with the Asbestos Hazard Emergency Removal Act, 15 U.S.C. § 2641 *et seq.* (hereinafter AHERA)

4. In a previous order, the court dismissed PSI's claim under § 12(2) of the Securities Act of 1933. (Doc. 340)

A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Aldrich Enters., Inc. v. United States,* 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

▬ The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). Once the moving party properly supports its motion, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Shapolia v. Los Alamos Nat'l Laboratory,* 992 F.2d 1033, 1036 (10th Cir.1993). The court reviews the evidence in a light most favorable to the non-moving party, *e.g., Washington v. Board of Public Utilities,* 939 F.2d 901, 903 (10th Cir.1991), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514.

### 1. *Section 10(b) and Rule 10b–5*

▬ In order to establish liability under Section 10(b), Rule 10b–5,[5] PSI must allege and prove facts showing that the conduct complained of occurred "in connection with" the purchase or sale of a security, that Kimbrells made an untrue statement of a material fact, or failed to state a material fact, that in so doing, the Kimbrells acted knowingly with intent to deceive or defraud, and that PSI relied on the misrepresentations and sustained damages as a proximate result of the misrepresentations or omissions. *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 986 (10th Cir.1992). PSI has the burden of establishing every element of its § 10(b) and Rule 10b–5 claim by a preponderance of the evidence. *Feldman v. Pioneer Petroleum, Inc.,* 813 F.2d 296, 301 (10th Cir.), *cert. denied,* 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987).

PSI has alleged that David and Janet Kimbrell are (a) each liable under Rule 10b–5 as primary violators; (b) both David and Janet Kimbrell are liable as "controlling persons" pursuant to § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a); (c) both David and Janet Kimbrell aided and abetted one another in committing the 10b–5 violation.

PSI has summarized the conduct it alleges constitutes a Rule 10b–5 violation in paragraph 40 of its amended complaint. PSI alleges both David and Janet Kimbrell knowingly or recklessly induced it to purchase their stock by (1) failing to disclose the likelihood of punitive administrative action by the EPA; (2) failed to disclose significant liabili-

---

**5.** Rule 10b–5 makes it unlawful for any person, in connection with the purchase or sale of a security

  (a) To employ any device, scheme, or artifice to defraud,

  (b) To make any untrue statement of a material fact or to omit to state a material fact neces-

sary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

  (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

ties; (3) failed to disclose the true value of Hall–Kimbrell's assets, its reputation, and projected income; (4) failed to disclose the extent to which Hall–Kimbrell was obligated to perform additional work without pay on projects already paid for; (5) and concealed and misrepresented contingent liabilities which are now or are likely to become due.

The court has reviewed the record and finds that PSI's allegations in paragraph 40 can be grouped together in two basic categories. First, PSI contends that the Kimbrells failed to disclose significant problems with the EPA and the likelihood of punitive administrative action by the EPA. Subparts (1) and (4) of paragraph 40 both relate to this allegation. Second, PSI contends that the Kimbrells failed to disclose accurate financial information about Hall–Kimbrell. Subparts (2) and (3) of paragraph 40 both relate to this allegation. Subpart (5) of paragraph 40 alleges a misrepresentation of contingent liabilities set out in paragraphs 1 through 30. This allegation is ambiguous and to the extent it refers to additional work Hall–Kimbrell may be obligated to perform pursuant to the outcome of the EPA's administrative action against Hall–Kimbrell, (5) is duplicative. To the extent (5) alleges additional contingent liabilities unrelated to the EPA action against Hall–Kimbrell, (5) is not pled with particularity as required by Fed. R.Civ.P. 9(b).[6]

---

**6.** The court has previously denied Kimbrells' motion to dismiss for failure to plead fraud with particularity. (Doc. 340) To the extent (5) is not duplicative, the court amends its earlier order to dismiss for failure to plead with particularity the claims regarding contingent liabilities unrelated to the EPA action against Hall–Kimbrell.

**7.** The arguments pertaining to Janet Kimbrell are found in Doc. 235, pp. 40–41; Doc. 266, pp. 41–48 and Doc. 290, pp. 16–20.

**8.** The court is aware that in a previous order, it stated Janet Kimbrell was under a duty to disclose certain information to PSI. This statement is not inconsistent with the views articulated in this opinion. The previous ruling was made in response to the Kimbrells' motion to dismiss. In ruling on a motion to dismiss, the court must assume the facts pleaded by the plaintiff are true. *See Housing Authority v. City of Ponca City*, 952 F.2d 1183, 1187 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1945, 118 L.Ed.2d 550

*Janet Kimbrell*

*Primary Violator*

The Kimbrells argue that PSI cannot prevail on any claim against Janet Kimbrell.[7] Several points are advanced. First, Kimbrells note that Janet Kimbrell did not participate in Hall–Kimbrell's AHERA program and had nothing to do with Hall–Kimbrell's financial assessments or projections. PSI does not dispute this fact, and also admits Janet Kimbrell did not participate in the negotiations between PSI and Hall–Kimbrell. (Doc. 235, Defendant's Statement of Uncontroverted Fact # 54). Nevertheless, PSI responds that notwithstanding her nonparticipation in the negotiations and a complete absence of any evidence that Janet Kimbrell knew *anything* of the matters about which PSI complains, Janet Kimbrell's constant access to her husband makes it reasonable to infer she discussed the stock transaction with her husband. According to PSI, the fact of their marital relationship, coupled with Janet Kimbrell's status as an officer and director of Hall–Kimbrell, mandates that the alleged primary liability of Janet Kimbrell on PSI's 10b–5 claim be submitted to a jury.

An essential element of PSI's 10b–5 claim against Janet Kimbrell is the existence of a duty owed by Janet Kimbrell to PSI. There are no facts in controversy regarding the existence of such a duty and the court finds, as a matter of law, that a duty did not exist.[8] Janet Kimbrell admittedly was silent

---

(1992). PSI alleged that Janet Kimbrell had made certain misrepresentations. Assuming this to be true, Janet Kimbrell would be under a duty to speak.

In a summary judgment motion, the court is no longer required to assume the plaintiff's allegations are true. PSI does not dispute that Janet Kimbrell remained silent throughout the stock sale. PSI has come forth with *no facts* supporting its earlier claim that she made "misrepresentations".

The court also notes that its previous discussion occurred in the context of deciding whether PSI could maintain an aiding-and-abetting claim against Janet Kimbrell. The Tenth Circuit has stated that the weight of authority is that even absent a *duty to disclose, silence and inaction* can be substantial assistance for aider-and-abettor liability provided the defendant consciously intended to assist the primary violation. *First Interstate Bank of Denver, N.A. v. Pring*, 969 F.2d 891, 899 (10th Cir.1992), *cert. granted* —— U.S.

"in connection with" the sale of her Hall–Kimbrell stock to PSI. Silence, absent a duty to disclose, is not misleading under Rule 10b–5. *Basic Incorporated v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988). The Tenth Circuit recently summarized this concept:

> The failure to disclose material information is actionable only "when (one) is under a duty to do so. And the duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between." (Citation omitted) A duty arises from the relationship between the parties not merely because one party has an ability to acquire information ... Without a duty to disclose, silence cannot be made fraudulent.

*Farlow*, 956 F.2d at 988.

In *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), the Supreme Court addressed the analogous issue of the legal effect of a defendant's silence. The defendant was a printer who deduced the names of the target companies in a corporate takeover before the final printing was completed. Without disclosing his knowledge, he purchased stock in the target companies and sold the shares after the takeover attempts were made public. The defendant was indicted for violating § 10(b) and Rule 10b–5 and convicted. The Supreme Court granted certiorari and reversed.

The Court noted that violations of § 10(b) had been found where corporate insiders used undisclosed information for their own benefit. *Id.* at 229, 100 S.Ct. at 1115. These violations were upheld in accordance with the common law rule that a party who is under a duty to disclose nonpublic market information may be liable for failing to make the disclosure. In contrast, a purchaser of stock who has no duty to a prospective seller because he is neither an insider nor a fiduciary

has been held to have no obligation to reveal material facts. *Id.* (Citations omitted)

Applying these principles, the Court concluded that the defendant's use of the nonpublic information was not fraud under § 10(b) because he was not subject to an affirmative duty to disclose it before trading. The Court found the trial court's jury instructions countenanced the view that the defendant owed a duty to everyone. The Court reversed the conviction and stated: "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak. We hold that a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." *Id.* at 235, 100 S.Ct. at 1118.

Like the defendant in *Chiarella*, Janet Kimbrell did not have a fiduciary or other similar relation of trust and confidence with PSI. In fact, there is no evidence to indicate Janet Kimbrell ever met or talked to any of PSI's officials. In these circumstances, the court finds that Janet Kimbrell's silence is not actionable under § 10(b). *See also Jensen v. Kimble*, 1 F.3d 1073 (10th Cir.1993) (a manipulative or deceptive omission under Rule 10b–5 is an omission which renders the other affirmative statements made by an individual misleading; such a result may occur, thereby giving rise to a duty to disclose, when the parties are in a "fiduciary or other similar relation of trust and confidence.")

Even if the court were to assume Janet Kimbrell had a duty to disclose, PSI cannot show that Janet Kimbrell acted with scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Id.* at 194 n. 12, 96 S.Ct. at 1381 n. 12. Although the Supreme Court expressly left open the question in *Hochfelder*, the Tenth Circuit, along with ten other circuits,[9] has held that recklessness may satisfy the element of scienter under Rule 10b–5.

––––, 113 S.Ct. 2927, 124 L.Ed.2d 678 (1993) (Citations omitted).

The court will make additional comments about the aiding-and-abetting claim against Janet Kimbrell, *infra*. Our holding of no primary liability against Janet Kimbrell dooms PSI's claim of aiding-and-abetting against David Kimbrell.

9. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568 n. 6 (9th Cir.1990), *cert. denied* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991).

*Hackbart v. Homes,* 675 F.2d 1114, 1117–18 (10th Cir.1982). Reckless behavior is conduct that is " 'an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Id.* at 1118.

■ PSI offers no evidence from which a reasonable factfinder could find scienter or reckless conduct by Janet Kimbrell. First, PSI misapprehends the standards governing summary judgment. It is firmly established that a party cannot avoid summary judgment by merely relying on its pleadings, but must set forth specific facts showing there is a genuine issue for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Devery Implement Co. v. J.I. Case Co.,* 944 F.2d 724, 726 (10th Cir.1991). PSI's bald allegation that Janet Kimbrell must have had knowledge of misrepresentations and concealment of facts is plainly insufficient to satisfy this standard.

■ Second, PSI's response to the Kimbrells' motion admits that Janet Kimbrell had no knowledge of any problems with the EPA. As for any misrepresentations or concealment of facts pertaining to the financial statements, PSI has produced no evidence suggesting Janet Kimbrell had knowledge of these. The court will not presume that Janet Kimbrell acted with scienter in the absence of evidence to support this inference.

■ Third, Kimbrells argue that Janet Kimbrell cannot be held liable solely on the basis of her marital status. The court agrees. *See Dodson v. Anderson,* 710 S.W.2d 510, 512 (Tenn.1986) (marital relationship alone does not render one spouse liable for the fraudulent actions of the other).

The court finds that there are no disputed facts regarding Janet Kimbrell's role in the transaction with PSI and, as a matter of law, Janet Kimbrell cannot be a "primary violator" under § 10(b) and Rule 10b–5.

### Controlling Person Liability

■ Kimbrells argue that Janet Kimbrell cannot be held liable as a "controlling" person under § 20(a). This section provides in relevant part:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

PSI relies on *San Francisco–Oklahoma Petro. Explor. v. Carstan Oil,* 765 F.2d 962 (10th Cir.1985), for the proposition that Janet Kimbrell can be liable as a "controlling" person. In *Carstan,* the court addressed whether a defendant could be held liable as a "controlling" person.[10] In *Carstan,* the plaintiff sought to rescind its purchase of a working interest in an oil well. William Rogers provided the money to organize the company selling the interests in the oil properties and was a director, the sole stockholder, and signed corporate reports. However, his son, Courtney Rogers, was the active party in the company. Courtney was having trouble with creditors, so he had his father appear as the owner and director.

The court approved the trial court's finding that William Rogers was a "controlling person" for purposes of 15 U.S.C. § 77o. It found inconsistent the trial court's finding that William Rogers did not have knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability of the "controlled person" (Courtney Rogers) was alleged to exist. For this reason, it reversed the trial court's finding of no

---

10. *Carstan* addressed whether an individual was a "controlling" person under 15 U.S.C. § 77o, the analogous provision of the Securities Act of 1933.

liability as to William Rogers. The court pointed out that "The Act says 'no knowledge of ... the existence of the facts' is necessary to escape liability." *Id.* at 964.

The court is unable to accept PSI's argument that *Carstan* supports its position. In *Carstan*, William Rogers was found to be a "controlling person" on the basis of facts which the court supposes can be analogized to *David Kimbrell's* involvement in this case. Completely absent are facts to support Janet Kimbrell's involvement as a "controlling person" or, for that matter, as a "controlled person." The most PSI can muster is a weak argument that "Janet Kimbrell was a director and substantial shareholder in Hall–Kimbrell before its purchase by PSI. She signed and submitted tax returns that stated she materially participated in the business activities of Hall–Kimbrell." (Doc. 266, p. 44) How? Given the amount of time and money which has been expended on this case, PSI must be expected to cite facts to support such an expansive conclusion.[11]

The court concludes that *Carstan* does not support PSI's position, either factually or legally.

In *Wilson v. Al McCord Inc.*, 858 F.2d 1469 (10th Cir.1988), the court addressed whether an individual was a "controlling person" within the meaning of an Oklahoma statute that is indistinguishable from the federal statute at issue in this case. In *Wilson*, investors sought to rescind their purchase of oil and gas wells. The defendant corporation was a family-owned business with Al McCord, its president, holding 51% of its stock and his wife, Rosemary McCord, holding 49%. Both acted as directors along with a third person. Rosemary McCord served as the corporation's secretary, but had little influence over its daily operations. The investors sought to hold Rosemary McCord liable as a "controlling person". Their theory was that because she served as a director, secretary, and 49% stockholder of the corporation, she had a duty to oversee its operations.

The court held the plaintiffs could not establish that Rosemary McCord was a "controlling person" under the statute. Rosemary McCord testified without contradiction that she had no knowledge about the corporation's activities. Furthermore, she was only one of three directors and a minority stockholder and therefore could not direct corporate affairs. *Id.* at 1474–75.

The court views *Wilson* as being more analogous to the facts of this case. Janet Kimbrell's position closely resembled Rosemary McCord's position in *Wilson*. Although she was an officer and owned a sizeable block of stock in Hall–Kimbrell, her role in the day to day operations of the corporation was minimal, as evidenced by her lack of knowledge of EPA regulation of Hall–Kimbrell's business. Like Rosemary McCord, she appears to have deferred to her husband in matters concerning the operation and management of the corporation. PSI implicitly acknowledges this fact when it alleges that David Kimbrell was a "hands-on" president who controlled virtually every major aspect of Hall–Kimbrell's business. (Doc. 266, p. 10) PSI also admits Janet Kimbrell did not participate in any of the negotiations leading up to the sale of her stock.

The court holds as a matter of law that Janet Kimbrell was not a "controlling" person under § 20(a).

### David Kimbrell

PSI's claims against David Kimbrell have been summarized at pp. 1293–1294, *supra*. To reiterate, the claims can be grouped into 2 categories: (1) Kimbrell failed to disclose significant problems with the EPA and the likelihood of punitive administrative action by the EPA involving some of Hall–Kimbrell's projects; and (2) Kimbrell failed to disclose accurate financial information about Hall–Kimbrell.[12]

### EPA Problems

PSI's claims regarding EPA problems arise, in part, from a comment contained in a

---

**11.** The court does not profess to be an expert on corporate tax returns but it has yet to see a return which states the participation of the taxpayer in the business.

**12.** The arguments pertaining to David Kimbrell are found in Doc. 235, pp. 44–55; Doc. 266, pp. 50–54; Doc. 290, pp. 23–28; and Docs. 358, 387, and 502.

Private Placement Memorandum (PPM) which was prepared for Hall–Kimbrell in November, 1988, when Hall–Kimbrell was offering to sell preferred stock. The comment states:

Hall–Kimbrell may have potential liability to numerous clients should it fail to comply with not only the contractual obligations but federal laws and regulations, particularly AHERA and numerous state regulations relating to asbestos handling, abatement, surveying, and submission of reports. Hall–Kimbrell undertook to submit numerous AHERA management plans to school clients in order for the clients to meet the October 12, 1988 deadline for submission of such plans to State agencies. The failure of any such AHERA management plan to conform to regulatory requirement may expose the Company to potential responsibility to perform additional work without additional compensation, potential contractual damage claims and regulatory fines. Such claims may have a material adverse effect on the Company.

The undisputed facts indicate that in 1988 and 1989, Hall–Kimbrell was involved in a controversy concerning whether, under AHERA regulations, it had properly considered gypsum wallboard (sheetrock) and hard wall plaster to be "asbestos containing materials" (ACM) when it inspected schools for the presence of asbestos. While there appears to be much in dispute about the details of the controversy (Doc. 235, pp. 55–77 and responses thereto), the details are not material to the issues presented by the motion. What is material is that the controversy (1) involved not merely Hall–Kimbrell, but rather all companies in the business of asbestos inspections and (2) the controversy was not resolved at the time of the sale to PSI.

There does not appear to be any dispute that PSI knew about the so-called "wallboard controversy" prior to the sale. (Doc. 235, ¶ 70, which the court deems uncontroverted due to PSI's failure to controvert the substantive aspects of the statement. D.Kan.Rule 206(c)). Indeed, since PSI was (and is) in the same business as Hall–Kim-

brell, it would be illogical for PSI to argue otherwise. Rather, the dispute centers around what David Kimbrell told, or failed to tell, PSI about Hall–Kimbrell's exposure to claims by clients, as well as potential fines by the EPA, arising out of its failure to inspect wallboard in various schools. (Doc. 235, ¶ 79–85 and responses thereto). As PSI puts it: " . . . the fact of impending EPA citations, fines and penalties against Hall–Kimbrell would be material to a potential purchaser in shares of Hall–Kimbrell." (Doc. 266, p. 52).

Returning for a moment to the PPM, the facts are undisputed that PSI knew of the existence of the PPM prior to the sale. Tom Powers, executive vice-president of PSI, who initiated contact with David Kimbrell regarding the possible acquisition of Hall–Kimbrell, and who was PSI's point man during the due diligence period, knew no later than October, 1989, about the earlier private offering and Powers says he requested the PPM at that time. (Doc. 235, ¶ 14 and response thereto). It appears to be uncontroverted that Powers did not receive the PPM prior to closing. There is a dispute over whether the PPM may have been given to other representatives of PSI (Doc. 235, ¶ 38 and responses thereto), but, as will be seen, the dispute over the PPM is immaterial because PSI knew from other sources about Hall–Kimbrell's "potential liability" mentioned in the PPM.

The extent of PSI's knowledge of Hall–Kimbrell's potential problems with the EPA can be derived to some degree from Kimbrell's uncontroverted statement of fact ¶ 83 and 84 and PSI's responses thereto (citations to the record have been omitted):

### Kimbrell's Statement

83. PSI also learned about the issues surrounding Michigan's interpretation of AHERA from outside sources. PSI's general counsel, Mark Weiland, learned about the potential acquisition of Hall–Kimbrell in early October 1989. Weiland dep. at 18 *et seq.* He contacted PSI's asbestos coordinator, Maggie Brown,[13] to ask her if she was familiar with Hall–Kimbrell. *Id.* at 22. Ms. Brown had been a PSI employee

---

**13.** Brown also goes by the name Margaret Man-inger–Brown.

since 1987. Weiland dep. at 32–33. She told Mr. Weiland that she had substantial concerns about the company. *Id.* at 26. She had had conversations with sources at the EPA and the State of Illinois concerning Hall–Kimbrell's inspections under the AHERA statute, and that was the basis of her concern. *Id.* at 28. Ms. Brown told Mr. Weiland later that she had heard Hall–Kimbrell was "bad news" from her sources. Weiland dep. at 43. In the fall of 1989, unlike Hall–Kimbrell, PSI treated sheetrock and hard plaster walls as a suspect ACM. Weiland dep. at 38. Mr. Weiland told Mr. Powers about these concerns of Ms. Brown sometime in October or November 1989. Weiland dep. at 30. But, Mr. Powers did not follow up on the issue until sometime later. Powers dep. at 359. When Mr. Powers finally spoke to Maggie Brown, she told him that a person from the EPA told her about Hall–Kimbrell problems with AHERA inspections in Michigan. *Id.* and Ex. 228.

### PSI's Response

83. The "uncontroverted facts contained in 83 are essentially correct except that the state of Illinois is not mentioned in the reference and it is incomplete in that it does not include the reference from Tom Powers that he had called David Kimbrell directly and was told that there wasn't a problem. (Depo. of Weiland, p. 32)

### Kimbrell's Statement

84. On December 22, 1989, Tom Powers talked with David Kimbrell concerning Hall–Kimbrell AHERA problems in Michigan. Powers dep. at 358–360 and Ex. 228. Mr. Powers contacted Mr. Kimbrell about these issues because PSI did not want to acquire any liabilities. Powers dep. at 361. But by this time PSI had already decided to acquire Hall–Kimbrell. Before the closing, therefore, Mr. Powers did not pass along any of the information he learned from Ms. Brown to Mr. Hal Ahlberg, Mr. Stan Stanley or Mr. Paternot. Powers dep. at 366.

### PSI's Response

84. "Uncontroverted fact" 84 is essentially correct except that there is no basis for the statement "but, by this time PSI had already decided to acquire Hall–Kimbrell." Powers testified that he confronted Kimbrell because he was concerned that the problem in Michigan was serious and might threaten the agreement, and might be an expensive proposition for PSI. Powers relied on what Kimbrell told him that that may have been an issue but it was "insignificant, it was of no importance to anybody." (Depo. of Powers, pp. 362–363).

The information learned by PSI's "asbestos coordinator" Maggie Brown is significant. Portions of Ms. Brown's deposition have been appended to Docs. 358 and 387 and the court has read them carefully. Ms. Brown testified that sometime in November, 1989, she had conversations with Harry Angelos, an EPA employee,[14] who told her that Hall–Kimbrell was having compliance problems with "a lot of" its AHERA management plans and that Hall–Kimbrell "would have to fix them." Ms. Brown did not think that Angelos was responsible for determining compliance; rather, the advice was offered out of Angelos' concern that "... PSI was going to become involved with a company which had not done things correctly and which had incurred terrible liabilities, that would affect PSI very badly." Ms. Brown already shared this concern: "The ... information from the EPA simply solidified the alarm that I felt at taking on that kind of organization."

Ms. Brown relayed her concern to Mark Weiland, PSI's chief counsel, who told her to talk with Powers. Ms. Brown told Weiland that from her knowledge from "... when I was doing field work and from friends in the field, that it—Hall–Kimbrell was not the great asbestos guru that it thought it was,

---

**14.** At the deposition, Ms. Brown refused, pursuant to wholly improper advice from PSI's counsel, to identify the employee. After the deposition, the magistrate ordered her to provide the name and she did so. In a pleading filed December 15, 1992 (Doc. 465), Kimbrells informed the court that Angelos' deposition "has not been taken". There is nothing in the record to indicate that Angelos was subsequently deposed.

that in fact, very often they did shoddy work, but they put out good looking slick reports; that now I'd heard from the EPA that there were a number of management plans in trouble." Then, sometime between the end of November and mid-December, 1989, Ms. Brown gave the same information to Powers, who said he would "look at it".

PSI's response to this evidence is that Powers talked to Kimbrell, who assured him it was "no big deal" or words to that effect. Powers ". . . relied on what Kimbrell was telling me that this may have been an issue but it was insignificant, it was of no importance to anybody."

In short, the PPM pales in comparison with the information given by Brown to Weiland and Powers. To the extent there is a dispute regarding PSI's pre-sale knowledge of Hall–Kimbrell's problems with the EPA, it is one over immaterial details, not substance.

### Financial Disclosures

In its amended complaint, PSI alleges it relied significantly upon the 1988 financial statements of Hall–Kimbrell. It contends these financial statements grossly overstated the 1988 revenues and profits of Hall–Kimbrell.

It is uncontroverted that David Kimbrell met with Powers and Hal Ahlberg on September 27, 1989. During that meeting, Kimbrell indicated that Hall–Kimbrell's 1988 financial statements reported sales of $44 million. Kimbrell told Powers and Ahlberg that Hall–Kimbrell was restating income and the actual 1988 sales figure should have been approximately $39 million rather than $44 million. Powers testified in his deposition that he thought this was unusual and "it sounded almost unethical to me." (Powers deposition, pp. 77–78).

The parties discussed the potential acquisition in a meeting at PSI headquarters on October 3, 1989. Following this meeting, PSI selected a team to conduct due diligence on Hall–Kimbrell. This team included Stan Stanley, Jerry Armstrong, an outside CPA who PSI had used on other occasions, Pat Patterson, an attorney at PSI Holding, and Tom Powers. By due diligence, PSI meant to obtain financial information, information on employees such as salaries, benefits, insurance information, equipment, capital leases, operating leases, and facilities information.

PSI proceeded to conduct a due diligence review of Hall–Kimbrell from early November, 1989, through closing. PSI requested information using a standard punch list of items Armstrong had developed. Armstrong contacted Hall–Kimbrell employees Don Chew and Chris Claterbos to obtain specific information on approximately 125–150 specific projects. Based on the information he received, Armstrong prepared a report setting forth his findings. Armstrong advised PSI that Hall–Kimbrell's earnings estimates were overly optimistic and its profit projection "does not appear reasonable." Armstrong noted that Hall–Kimbrell did not maintain actual job cost records on individual jobs, and it would take a considerable amount of time to determine the accurate status of all jobs in progress. He noted that many of Hall–Kimbrell's AHERA management plans were rejected and would entail additional costs to correct. The report stated that David Kimbrell wanted to redo the 1988 income statement to take into account these unanticipated costs.

It is uncontroverted that prior to its acquisition of Hall–Kimbrell's stock, PSI knew that Hall–Kimbrell had lost $1.3 million for the first eleven months of 1989. PSI also knew this was a substantial variance from the forecast it had previously been provided.

### Justifiable Reliance

David Kimbrell contends that PSI cannot demonstrate that it justifiably relied on either his alleged failure to disclose the proper status of the EPA's enforcement posture against Hall–Kimbrell or his alleged failure to disclose financial information.

▮▮▮▮ Justifiable reliance on the misrepresentation or omission is a necessary element to liability under § 10(b) and Rule 10b–5. *Zobrist v. Coal–X, Inc.*, 708 F.2d 1511, 1516 (10th Cir.1983). Several factors may be relevant in determining whether PSI's reliance was justifiable:

(1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Id.* No single factor is determinative and all must be considered and balanced. *Id.* at 1517. Moreover, the court must be mindful that

> [j]ustifiable reliance is not a theory of contributory negligence; rather, it is a limitation on a rule 10b–5 action which insures that there is a causal connection between the misrepresentation and the plaintiff's harm. Only when the plaintiff's conduct rises to a level of culpable conduct comparable to that of the defendant's will reliance be unjustifiable. *In this circuit, such conduct must amount to at least reckless behavior.*

*Id.* at 1516 (emphasis added; citations omitted). The element of justifiable reliance denies recovery to a plaintiff who has "close[d] his or her eyes and refuse[d] to investigate in disregard of a known risk or a risk so obvious that the plaintiff must be taken to have been aware of it." *Grubb v. FDIC,* 868 F.2d 1151, 1163 (10th Cir.1989).

Applying the *Zobrist* factors to the case before the court, it is abundantly clear that PSI both possessed and possesses a high degree of sophistication in the realm of financial affairs, as well as knowledge of the asbestos inspection and removal business. Its corporate structure is highly complex. Tom Powers testified that his responsibilities as manager of PSI's acquisition program were to identify, evaluate, price, and negotiate acquisition agreements with potential candidates. In that capacity, he looked at approximately 400 companies in the period from 1988–1991. PSI acquired 32 companies in that 4–year period. In total, PSI has acquired 50 companies since its incorporation. It retains accountants to investigate a target acquisition's financial background and independently ascertains a target's reputation. The transaction in question appears to have been a routine part of PSI's business. This factor weighs in Kimbrell's favor.

PSI and the Kimbrells did not have a longstanding business relationship. The theory underlying this factor is that a party can rely to a greater extent on the integrity of persons with whom he or she has had prior experience dealing with because they have had a better opportunity to gauge the other party's character and reputation. The absence of such a relationship would give PSI less reason to trust the Kimbrells, and thus weighs in Kimbrell's favor.

In theory, the Kimbrells should have had greater access to information concerning the EPA's enforcement posture against Hall–Kimbrell, Inc. However, in the circumstances of this case, the opposite is true. PSI's business included work in the asbestos field; it had some knowledge of the EPA's regulation of its own line of work. More importantly, PSI was informed by Harry Angelos,[15] an EPA official who worked in Region V,[16] that Hall–Kimbrell's management plans were not in compliance with EPA's regulations "and that there were a lot of them." Angelos informed Brown that "it was something the EPA was going to pursue." In contrast, Hall–Kimbrell was aware that several state officials had expressed the view that Hall–Kimbrell's position on sampling wallboard was erroneous. Representatives of Hall–Kimbrell went to Washington, D.C. in the fall of 1989 to meet with EPA officials concerning the EPA regulations, but as late as December 4, 1989, the EPA informed Hall–Kimbrell not to expect an answer from the EPA on the wallboard issue before the end of 1989. PSI also had extensive access to Hall–Kimbrell's financial records. Jerry Armstrong, the accountant re-

---

**15.** Angelos' job duties included conducting training programs and performing side audits.

**16.** Region V included the State of Michigan. When Powers confronted David Kimbrell on December 22, 1989, about Angelos' comments, Powers specifically asked Kimbrell about potential problems in Michigan. (Powers' deposition at 361–62)

tained by PSI, prepared a detailed report describing the financial health of Hall–Kimbrell. Tom Powers testified that PSI had utilized Armstrong's services on previous occasions, and Armstrong had a standard punch list of information that he requested from a potential acquisition candidate. On the allegations concerning likely adverse action by the EPA as well as the financial information issue, this factor favors Kimbrell.

The parties did not have a fiduciary relationship.[17] This court has previously issued an order denying the Kimbrells leave to file an action for an accounting because they had failed to allege the existence of a fiduciary relationship. (Doc. 388) *Professional Service Industries, Inc. v. Kimbrell,* 802 F.Supp. 383 (D.Kan.1992). While our ruling specifically addressed whether PSI owed the Kimbrells a fiduciary duty, the reverse is true as well: the Kimbrells did not owe PSI a fiduciary duty. PSI has alleged no facts that tend to show that the Kimbrells consciously assumed a duty to act for PSI's benefit. *Rajala v. Allied Corp.,* 919 F.2d 610, 615 (10th Cir. 1990), *cert. denied* —— U.S. ——, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991). The stock sale appears to have been an arms-length transaction.

The existence of a fiduciary relationship would place a heightened duty on the fiduciary to disclose information and reduce the degree of reliance expected of the other party. *See Stevens v. Jayhawk Realty Co.,* 9 Kan.App.2d 338, 342, 677 P.2d 1019 *rev. denied* 236 Kan. 90, 689 P.2d 786 (1984) (existence of principal-agent relationship creates fiduciary duty that broadens scope of defendant's duty to plaintiff). The absence of a fiduciary relationship favors Kimbrell on this factor.

David Kimbrell was theoretically in a better position to conceal the alleged fraud by virtue of the fact that he understood the activities of his own business better than PSI. Additionally, David Kimbrell allegedly instructed one of his employees not to give PSI a copy of the private placement memorandum which contained a statement warning

potential investors of possible problems with the EPA on the wallboard issue and the attendant adverse financial consequences. However, as pointed out, *supra,* PSI was familiar with Hall–Kimbrell's line of work, had an extensive opportunity prior to the stock sale to probe Hall–Kimbrell's financial records using its own accountant, and had contacts with the EPA prior to the stock sale which provided adverse information about Hall–Kimbrell's exposure to future liability. These facts all tend to suggest PSI had a significant opportunity to detect any fraud David Kimbrell may have committed. Moreover, there is no information in the withheld private placement memorandum that PSI did not already know *prior* to the stock transaction based on its contact with Harry Angelos. It is axiomatic that a party cannot conceal what the other party already knows. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

PSI also was aware of certain discrepancies in the financial information provided to them and knew Hall–Kimbrell was losing money at the time of the acquisition. In a September 27, 1989, meeting, David Kimbrell provided PSI some sales and pretax profit information and told Tom Powers that the 1988 income figures had been overstated by approximately $5 or $6 million. Powers testified that PSI was aware prior to December 29, 1989, that Hall–Kimbrell had incurred a net loss of $1.3 million during the period from January, 1989, through November 30, 1989. PSI knew this loss figure represented a substantial variance from the forecast it had previously received. Due to the nature of Hall–Kimbrell's internal accounting methods, PSI was informed by Armstrong prior to the acquisition that it was impossible to determine what Hall–Kimbrell's profits might be because Hall–Kimbrell had no job cost accounting on its work in progress. PSI assumed Hall–Kimbrell's financial records were not accurate. This assumption was a major reason why PSI was interested in an

---

**17.** In its response (Doc. 496) to Kimbrells' motion for summary judgment on PSI's common law claims, PSI concedes that "dismissal of its claim for breach of fiduciary duty against the Kimbrells is warranted."

adjustment-type contract.[18] Under this type of contract, discrepancies in the financial statements could be resolved by adjusting the purchase price. (See Stock Purchase Agreement, Article 1, Section 1.2) In the court's view, the concealment and opportunity to detect the fraud factors favor Kimbrell.

PSI initiated the stock transaction. PSI learned from a newspaper article that a potential merger between Hall–Kimbrell, Inc. and another company had fallen through. PSI thereafter contacted David Kimbrell to discuss a possible acquisition. Additionally, there is evidence to suggest that PSI sought to expedite the transaction because it knew that Hall–Kimbrell was losing money and it wanted to obtain control to try to stem the flow of red ink. This factor favors Kimbrell.

Finally, the nature of the misrepresentations and omissions is fairly general. This factor does not seem to weigh strongly in either party's favor.

Kimbrell's reliance argument on the failure to disclose the likelihood of EPA action boils down to this: PSI was informed by an EPA official in a general but unmistakable way that the EPA did not consider Hall–Kimbrell's management plans in compliance with EPA regulations and would take action against Hall–Kimbrell, and that PSI's involvement with Hall–Kimbrell would affect PSI very badly. On the other hand, PSI was informed by David Kimbrell that the EPA agreed with Hall–Kimbrell's interpretation of the AHERA regulations and any problems with the EPA were insignificant. Who would a reasonable, sophisticated investor in PSI's position believe: the EPA's official's view of what action the EPA would take or David Kimbrell's view of what action the EPA would take?

The court finds PSI was reckless in relying on David Kimbrell's statements. It is signifi-

cant to the court that PSI is not a neophyte in the world of business, but is a large corporation with a high degree of sophistication and business acumen. Cf. *Jensen v. Kimble*, 1 F.3d at 1078, n. 9; *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir.1987) (plaintiffs' sophistication undercut their claims of reliance). As between Angelos and Kimbrell, Angelos was clearly in a superior position to know the EPA's position and communicated this information to PSI. Kimbrell, on the other hand, was in an inferior position to know and also had a major financial stake in telling PSI that problems with the EPA were minor. PSI's characterization of Brown's contact with Angelos as a rumor is inaccurate to the extent it conveys the connotation that Angelos' views were not to be taken seriously.[19] (Doc. 266, p. 55) Perhaps PSI would be justified in placing its faith in the Kimbrells had the parties enjoyed a long-standing business relationship. In fact, the parties had known each other for a relatively short time. Furthermore, the court finds it very significant that the transaction was worth tens of millions of dollars. The sheer size of the transaction militates against a blind acceptance of Kimbrell's statements. In essence, PSI believed and acted upon what it wanted to hear, not what a reasonable, sophisticated investor should have believed in these circumstances.

PSI fares no better on its claim that David Kimbrell misrepresented the financial condition of Hall–Kimbrell. PSI performed its own investigation of Hall–Kimbrell's financial records and understood prior to December 29, 1989, that Hall–Kimbrell was losing money—$1.3 million in the first eleven months of 1989. PSI proposed using the adjustment-type contract because of its expectation of inaccuracies in Hall–Kimbrell's financial statements. The type of contract thus tends

---

18. Powers testified, "There has never been a balance sheet that I have looked at in my acquisition experience that has proven to be accurate and Hal Ahlberg and Armstrong feel the same way." (Powers deposition at 334.)

19. The court is not persuaded by the suggestion that Angelos was just some low-level EPA employee who had no control over the outcome of the Hall–Kimbrell/EPA dispute. Angelos' position is not material. What *is* material is Maggie

Brown's reaction to Angelos' statements. The record is clear that she was in a position to appreciate the significance of his statements insofar as they bore on PSI's intended acquisition of Hall–Kimbrell and that she communicated not just Angelos' statements but her own concern in unmistakable terms to the PSI negotiators. By going ahead with the deal, PSI ignored not just Angelos; it ignored Brown.

to undercut PSI's claim of reliance. *Cf. Smolen v. Deloitte, Haskins & Sells,* 921 F.2d 959, 965 (9th Cir.1990) (fact that Stock Purchase Agreement provided for adjustment of the sale price in accordance with 1982 audit inventory figures showed that plaintiff did not actually rely on any 1982 information allegedly provided by defendant prior to the closing). Furthermore, the allegedly fraudulent information David Kimbrell provided that PSI claims to have relied upon, the 1988 financial records, was not the most recent information available to PSI. The more recent information, which reflected the fact that Hall–Kimbrell was losing money, should at least have cast doubt on the reliability of the earlier, more optimistic information PSI had received.

PSI offers two reasons for its reliance upon David Kimbrell's assurances during the December 22, 1989, telephone conversation with Tom Powers. First, David Kimbrell had repeatedly assured Powers and Jerry Armstrong, the accountant engaged by PSI to examine Hall–Kimbrell's financial records, that he was well respected by the EPA. Second, Powers' discussions with service users in the asbestos field reflected that Hall–Kimbrell was considered a leader in the field.

The first proffered reason is clearly insufficient to establish justifiable reliance. David Kimbrell's self-serving characterization of his own reputation is not surprising. David Kimbrell had millions of dollars at stake in the transaction and had every reason to portray himself and his company in the best light possible. If the court were to accept PSI's argument, a plaintiff in a Rule 10b–5 case would be entitled to close their eyes and rely upon the veracity of a defendant. This argument is contrary to the holding of *Zobrist* and would completely eviscerate the justifiable reliance element of Rule 10b–5.

The second proffered reason is also insufficient. The cited portion of Powers' deposition *contains no mention of any discussions with other service users in the asbestos field.* (Doc. 387, p. 8) Even if such discussions took place, Hall–Kimbrell's good reputation among its competitors cannot justify a blind reliance on David Kimbrell's statements on the likelihood of EPA action when an EPA official informs PSI to the contrary. *See Atari Corp. v. Ernst & Whinney,* 970 F.2d 641, 646 (9th Cir.1992), amended and superseded by 981 F.2d 1025 ("If the investor already possesses information sufficient to call the representations into question, he cannot claim later that he relied on or was deceived by the lie. This is ... because the securities laws create liability only when there is 'substantial likelihood' that the misrepresentation 'significantly altered the total mix of information' that the investor possesses.") (quoting *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132).

The court believes this case is analogous to the facts of *Zobrist.* In *Zobrist,* the plaintiff-buyer argued that he justifiably relied on the oral representations of the defendant-sellers when purchasing an interest in a coal mining operation. Although defendants had orally assured plaintiff that his investment "couldn't miss" and was a "sure thing," a private placement memorandum provided by defendants clearly stated the risks involved in the investment. The court held that plaintiff must be charged with constructive knowledge of the contents of the private placement memorandum, lest investors be rewarded for their failure to read such a prospectus. 708 F.2d at 1518–19. Imputing such knowledge to the plaintiff, the court then concluded that, as a matter of law, plaintiff had "acted recklessly by intentionally closing his eyes to and failing to investigate the contradiction between the misrepresentations and the information in the memorandum." *Id.*

Like the plaintiff in *Zobrist,* PSI had knowledge that clearly indicated the risks involved in its prospective investment, yet closed its eyes and relied instead on David Kimbrell's oral representations to the contrary. PSI was obligated to go further than merely obtaining a contrary response from Kimbrell to Angelos' views. Additionally, PSI received up-to-date financial information from Hall–Kimbrell prior to the transaction that indicated "a substantial variance" from the financial projections David Kimbrell had previously provided. PSI cannot use the securities laws as a form of insurance for its poor business judgment. *See Freeman v.*

*Laventhol & Horwath,* 915 F.2d 193, 198 (6th Cir.1990).

■ The court finds PSI has failed to show it justifiably relied on any of David Kimbrell's alleged misrepresentations.

### Aiding and Abetting

■ Our holding renders PSI's claims of aiding and abetting liability against the Kimbrells and "controlling person" liability against David Kimbrell untenable. To establish aider-and-abetter liability, PSI must prove (1) the existence of a primary violation of the securities laws by another; (2) knowledge of the primary violation by the alleged aider-and-abetter; and (3) substantial assistance by the alleged aider-and-abetter in achieving the primary violation. *First Interstate Bank of Denver,* 969 F.2d at 898. PSI has failed to establish the existence of a primary violation of § 10(b) and Rule 10b–5. Likewise, the predicate for imposition of "controlling person" liability is another person who is liable for violations of the securities laws. 15 U.S.C. § 78t(a). Our holding of no primary violation precludes such a claim.

### 2. Common Law Fraud

■ PSI has also alleged a claim of fraud pursuant to Kansas common law.[20] Fraudulent misrepresentation includes affirmative acts and misstatements of fact as well as the concealment of acts or facts which legally or equitably should be revealed. *Albers v. Nelson,* 248 Kan. 575, 579, 809 P.2d 1194 (1991) (Citation omitted). "Actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, which is made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his or her injury and damage." *Id.* (Citation omitted)

■ The court believes that the justifiable reliance element of a common law fraud action is indistinguishable from the justifiable reliance element of § 10(b) and Rule 10b–5.

---

20. The arguments regarding the Kansas claims are found in Doc. 235, pp. 55–57 and Doc. 266,

*Basic Incorporated,* 485 U.S. at 243, 108 S.Ct. at 989; *Slaymaker v. Westgate State Bank,* 241 Kan. 525, 532, 739 P.2d 444 (1987) (Citations omitted). For the reasons articulated previously in this opinion, the court holds that PSI cannot satisfy the justifiable reliance element of common law fraud.

Accordingly, Kimbrells' motion (Doc. 234) for partial summary judgment on PSI's claims under § 10(b) and Rule 10b–5, as well for common law fraud is granted. Any motions for reconsideration of this order shall be limited to 15 pages. Responses and replies shall be limited to 10 and 5 pages, respectively. All page limits include attachments and appendices.

IT IS SO ORDERED.