**W. David KIMBRELL and Janet Kimbrell, Plaintiffs,**

v.

**ADIA, S.A., a Swiss Corporation, Defendant.**

**Civil Action No. 92–4225–MLB.**

United States District Court, D. Kansas.

April 2, 1996.

John J. Immel, Lawrence, KS, Joseph R. Colantuono, Polsinelli, White, Vardeman & Shalton, Overland Park, KS, David A. Welte, Dennis J. Dobbels, Jeffery J. Matthews, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, for W. David Kimbrell, Janet Kimbrell.

Ron C. Campbell, William P. Tretbar, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, William R. Smith, Hershberger, Patterson, Jones & Roth, Wichita, KS, Michael G. McLaren, John H. Dotson, Stephen W. Vescovo, Thomason, Hendrix, Harvey, Johnson & Mitchell, Memphis, TN, Barry M. Heller, Brownstein, Zeidman & Lore, P.C., Washington, DC, David J. Butler, Swidler & Berlin, Washington, DC, for Adia, S.A.

### MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on ADIA's motion for partial summary judgment. (Doc. 169). The parties have thoroughly briefed the issues, (Docs. 170, 172, 176), and the court is prepared to rule.

#### Undisputed Facts [1]

David and Janet Kimbrell owned a majority interest in an environmental consulting company called Hall–Kimbrell Environmental Services, Inc. ("Hall–Kimbrell"). In January 1990, they sold their ownership interest in the company to Professional Service Industries ("PSI"), ADIA's subsidiary. In addition to other payments not relevant to ADIA's partial summary judgment motion, the stock purchase agreement ("SPA") between PSI and Hall–Kimbrell provided for a contingent "second" payment to be made to Hall–Kimbrell stockholders after closing, of which the Kimbrells would get their pro rata share. The SPA did not give a specific amount for the second payment; PSI was to calculate the second payment by offsetting against certain of Hall–Kimbrell's liabilities at the end of the review period an additional

---

1. Many of these facts are set out in this court's January 29, 1996 order, (Doc. 178), and are reiterated here for convenience.

$8,000,000 of Hall–Kimbrell's purchase price and Hall–Kimbrell's cash and collected amounts after a specified period of time.[2] (Doc. 170, Uncontroverted Fact at ¶ 7, 8).

The contingent "second payment" provision was meant to resolve any discrepancies in Hall–Kimbrell's financial statements by adjusting the purchase price. *See Professional Serv. Indus., Inc. v. Kimbrell*, 834 F.Supp. 1289, 1303 (D.Kan.1993).

David Kimbrell testified concerning his understanding of the second payment calculation:

A:  I don't know about book value or any of that, all I know is that this is just PSI's way of doing merger, is to let all the assets and liabilities shake out rather than having speculation on each one of them.

Q:  But the $8 million was the starting point and that was going to be either adjusted upward or downward?

A:  That's correct.

(Doc. 170, Ex. G at 34).[3]

During the review period, PSI determined that Hall–Kimbrell's liabilities exceeded the specified additions and calculated that no additional money was due under the second payment provision for the stock of Hall–Kimbrell. (Doc. 170, Uncontroverted Fact at ¶ 9).

PSI sued the Kimbrells in this court July 1990, alleging securities fraud and breach of contract in connection with its purchase of Hall–Kimbrell. The Kimbrells counterclaimed for breach of contract because of PSI's failure to make a second payment to Hall–Kimbrell stockholders, as well as various other claims, but did not counterclaim for fraud. (Doc. 170, Uncontroverted Fact at ¶ 10; *PSI v. Kimbrells*, No. 90–1326 (D.Kan. filed July 5, 1990), at Doc. 127). This court granted Kimbrells' motion for summary judgment on PSI's claims. *Professional Serv. Indus., Inc. v. Kimbrell*, 834 F.Supp. 1289 and 834 F.Supp. 1305 (D.Kan.1993). These rulings left unresolved Kimbrells' counterclaims against PSI. However, in late 1993, after the court had entered summary judgment in Kimbrells' favor in the PSI case, PSI settled with the Kimbrells on the counterclaims against it and dropped out of the lawsuit. The Kimbrells released all claims against PSI regarding the second payment. (Doc. 170, Uncontroverted Fact at ¶ 10). ADIA was not informed of the settlement negotiations until after they were completed and declined an invitation to join the settlement under the terms offered. (See Doc. 142).

On November 17, 1992, before the settlement of the litigation with PSI, the Kimbrells filed this case against ADIA in Topeka. The Topeka case was later transferred to this court. The Kimbrells claimed that representatives of both ADIA and PSI fraudulently induced them to enter into the SPA with PSI. The specific false promises alleged by the plaintiffs were: (1) that David Kimbrell would remain the president of Hall–Kimbrell and would control its operations, (2) that $3 million would be paid for David Kimbrell's services as Hall–Kimbrell's president, and (3) that ADIA would infuse Hall–Kimbrell with $10 million in working capital. (Doc. 170, Uncontroverted Fact at ¶ 3).

Plaintiff sought to hold ADIA directly liable for false promise number (3), (Doc. 1 at ¶ 20), and liable under an alter ego theory for false promises (1) and (2). (Doc. 1 ¶¶ at 17–19, 20 and 39–46). Plaintiffs further alleged that they agreed to allow PSI to withhold $8 million from the purchase price as a "second payment" but that had they known of the false promises, they would not have sold their stock or agreed to defer the "second payment." (Doc. 1 at ¶¶ 23–25). Plaintiffs did not allege, however, that either ADIA or

---

2.  The parties and the court understand that the actual figure is plaintiffs' pro rata *share* of $8 million, but for simplicity, the figure will be referred to as $8 million.

3.  David Kimbrell gave this deposition testimony on May 23 and June 19, 1990, in the matter of *Patrick Gibbons v. Hall–Kimbrell Environmental Services, Inc. and David Kimbrell*, Civ. No. SA– 89–CA–1753 (W.D.Tex.). That action was a claim for damages by a former employee of Hall–Kimbrell whose employment was terminated in 1989. During the course of these depositions, David Kimbrell testified regarding the value of Hall–Kimbrell and his negotiations with other companies regarding the sale of the company.

PSI made any false promises about the second contingent payment itself.[4]

In an effort to clear up the confusion caused by Kimbrells' settlement with PSI, the court directed the parties to exchange and file letters explaining their claims and defenses in this case. The Kimbrells described their damage claim regarding the "second payment" in their counsel's letter of January 13, 1995:

In addition to the $3,000,000.00 plus accrued interest from the First Payment owed to the Kimbrells, the SPA provided for a Second Payment of an additional (1) $8,000,000.00 plus (2) Certificates of Deposit and cash on hand at the close of business on December 31, 1989, plus (3) the net amount collected by PSI before July 31, 1990 for notes receivable, invoiced accounts receivable and unbilled work performed prior to January 1, 1990 (with a 5% administrative expense deduction). SPA, § 1.2. From these additions, amounts in various categories of potential liabilities were to be subtracted. *Id.* The remaining amount was to be paid to each of the H–K shareholders, not later than July 31, 1990, based on their pro rata interest in H–K.

The Kimbrells would not have agreed to allow PSI to transfer $8,000,000.00 from the total purchase price to a Second Payment calculation but for the misrepresentations which induced the Kimbrells to enter into the SPA. There is no need, therefore, to attempt to recreate appropriate additions and deductions under the Second Payment provisions of the SPA. [footnote omitted] But for the misrepresentations, the $8,000,000.00 addition in the Second Payment would have been part of the total sale price.

(Doc. 170, Ex. A at 3–4).

Plaintiffs then filed a motion in limine to preclude ADIA from any mention of the various deductions that were possible under the second payment, stating that they had elected to rescind the SPA under the doctrine of election of remedies and that the deductions were therefore irrelevant. (Doc. 167). ADIA responded with a motion for partial summary judgment and a memorandum in opposition to the motion in limine and in support of summary judgment. (Docs. 169, 170). In its January 29, 1996 order, (Doc. 178), the court denied plaintiffs' motion in limine and deferred ruling on ADIA's summary judgment motion until it could hear arguments by counsel regarding the Kimbrells' apparent choice to rescind the SPA. (Doc. 178 at 8–13).

At a status conference held February 7, 1996, plaintiffs' counsel informed the court that plaintiffs were *not* intending to rescind the SPA, stating:

And I think that's where when we filed these briefs we weren't as clear as—when we were talking about, quote, rescissory damages, that was really more to define, not that we were seeking to rescind the contract, but that the damages were not on contract, never were on contract. That this all involved a fraudulent inducement. The question then becomes for what are the Kimbrells seeking damages? What are the elements of that recovery? And I think the parties in their letters at least understood one another on that and perhaps it got lost in the translation into the formal briefs, which I think it may have. In the letters that were filed.... [ADIA's counsel] states quite succinctly on page 3 that he understands the theories and what the damages are.

(Transcript of Hearing, Doc. 180 at 4–5).

The referenced "page three" of ADIA's counsel's letter states:

Plaintiffs claim that because of those promises, they agreed to "defer" $3,000,000 of the purchase price and to make it contingent on David Kimbrell's continued employment, and further agreed to defer the $8,000,000 portion of the Second Payment—and to make it subject to the Sec-

---

4. The SPA explicitly mentions the three $1 million payments alleged in promise (1) and makes reference to David Kimbrell's post-SPA employment, the subject of alleged promise (2). The issue regarding these promises will be dealt with later, either through summary judgment or trial. Alleged promise (3) is not mentioned in the SPA. The $8 million "second payment" is covered in a separate section of the SPA. (Doc. 170, Ex. E).

ond Payment calculation. Plaintiffs further claim that had they known the truth, they would not have agreed to any deferrals, these amounts would have been paid at closing, and would never have become part of contingent provisions of the SPA. In plain language, plaintiffs' argument is that David Kimbrell justifiably relied on oral promises of Yves Paternot and Hal Ahlberg, and that had he known (1) that he was not going to remain in charge of Hall–Kimbrell and (2) that Hall–Kimbrell was not going to be immediately infused with $10,000,000, he would never have agreed to any contingent payments, and that an additional $11 Million "would have been part of the sale price."

(Doc. 170, Defense Counsel's January 27, 1995 Letter, Ex. C at 3).

Thus, plaintiffs' counsel made clear at the hearing that the letters exchanged between the parties and filed with this court properly describe plaintiffs' damages claims and that no rescission is sought. With this established, the court is ready to rule on ADIA's partial summary judgment motion.

### Standards for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court reviews the evidence in the light most favorable to the non-moving party, e.g., *Watson v. University of Utah Medical Center*, 75 F.3d 569, 574 (10th Cir.1996), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

■ Although in Kansas fraud must be proven by clear and convincing evidence, a party is not required to meet this standard at the summary judgment stage. *Baumann v. Excel Indus.*, 17 Kan.App.2d 807, 815, 845 P.2d 65, 71 (1993); *Gorham State Bank v. Sellens*, 244 Kan. 688, 691, 772 P.2d 793 (1989). The court reviews the evidence submitted in opposition to summary judgment using the usual preponderance of the evidence standard. *Baumann*, 17 Kan.App.2d at 816, 845 P.2d 65.

### Discussion

ADIA moves for summary judgment on the limited issue of whether the Kimbrells may seek recovery of the contingent $8 million second payment under the SPA. In support of its motion, ADIA argues (1) that plaintiffs have not shown that ADIA's alleged misrepresentations caused the loss of the $8 million contingent second payment, (2) that plaintiffs' claim to the $8 million is speculative, and (3) that plaintiffs are bound by PSI's calculation that Hall–Kimbrell's deductions exceeded $8 million under the second payment provision. (Doc. 170 at 6).

### A. Causation

■ ADIA first argues that plaintiffs have not shown that ADIA's alleged misrepresentations caused them to lose the $8 million contingent payment. (Doc. 170 at 17–19). Plaintiffs do not respond to ADIA's argument except to state:

> Once again ADIA's arguments are based on the faulty premise that the Second Payment calculations for[m] a part of the Kimbrells' claimed damages.
>
> The Kimbrells are *NOT* electing to affirm the Second Payment provisions of the SPA contract and sue for contractual damages. The Kimbrells are electing to *RESCIND* those provisions and seek their rescissionary damages.

(Doc. 172 at 10–11) (emphasis in original).

Before continuing further, the court notes an important undisputed fact which is relevant to the issue of causation: Plaintiffs are not seeking to hold ADIA responsible under an alter ego theory for any actions of PSI *after* the sale of Hall–Kimbrell. (Doc. 170, Uncontroverted Fact at ¶ 2, Ex. C at 3). In other words, plaintiffs are not claiming ADIA, as the alter ego of PSI, wrongfully calculated the second payment as being zero. Rather, plaintiffs' view is that ADIA was PSI's alter ego *during* the negotiation phase and that without ADIA's fraudulent promises during the negotiation process, plaintiffs

would not have agreed to defer the $8 million second payment but instead would have demanded it up front.[5] Thus, the issue before the court is whether there is sufficient causal connection between ADIA's alleged false promises during the negotiation process and PSI's post-sale decision to pay nothing under the second payment provision.

To meet the causation element of fraud, plaintiffs must first show that they would have demanded, and gotten, the $8 million up front. Second, plaintiffs must show that the loss of the $8 million was *proximately* caused by ADIA's alleged misrepresentations. *Canterbury Court, Inc. v. Rosenberg*, 224 Kan. 493, 503, 582 P.2d 261 (1978); Restatement (Second) of Torts § 548A (1977). The court finds that the evidence before it fails to satisfy either element of causation.

First, plaintiffs have not provided any evidence that they could have successfully demanded the $8 million up front. They have not produced evidence indicating that PSI would have considered a contract that did not include a contingent second payment provision. The evidence before the court is, in fact, all to the contrary. David Kimbrell testified that Hall–Kimbrell had lost money every month but one in 1989, (Doc. 176, Ex. I at 105), and that this effected the negotiations with PSI over the sale of the company:

A. Yes. By the time we got to negotiating price for the company, the company had sunk very, very bad, and they were not willing to pay any more.

And, at that point, we really had to take whatever our best negotiating skills could get us.... We really didn't have a lot of choice at that point.

(Doc. 176, Ex. I at 106).

In *Professional Serv. Indus., Inc. v. Kimbrell*, 834 F.Supp. 1289 (D.Kan.1993), the court found from the undisputed evidence that:

Powers testified that PSI was aware prior to December 29, 1989, that Hall–Kimbrell had incurred a net loss of $1.3 million during the period from January, 1989, through November 30, 1989. PSI knew this loss figure represented a substantial variance from the forecast it had previously received. Due to the nature of Hall–Kimbrell's internal accounting methods, PSI was informed by Armstrong prior to the acquisition that it was impossible to determine what Hall–Kimbrell's profits might be because Hall–Kimbrell had no job cost accounting on its work in progress. PSI assumed Hall–Kimbrell's financial records were not accurate. This assumption was a major reason why PSI was interested in an adjustment-type contract. [Footnote omitted].

*Id.* at 1302–03.[6] This finding has not been disputed.

Plaintiffs nevertheless argue that there is evidence that ADIA (speaking as PSI's parent) would have agreed to pay the entire purchase price up front. At the February 7 conference, plaintiffs' counsel contended:

Well, because ADIA's board of directors met and met before the negotiation that Yves Paternot went to and gave him authority to consummate the transaction up to and I believe it was 35 million.... So that provides evidence that "ADIA would have agreed to pay the entire amount up front but for the fraud."

(Doc. 180 at 17).

This argument is based upon the following portion of Yves Paternot's deposition:

Q. And with respect to [ADIA's board of director's] approval to proceed, the maximum price that had been set was thirty-five million subject to better negotiations?

A. Well, subject to—we were a bit uncertain as to what exactly the results would be for 1989 and the projections for '90. There were some areas of concern. And there is no question

---

**5.** At the February 7 conference, plaintiffs' counsel stated: "The damage issue is whether they [plaintiffs] would have required the payment to be made up front *and then whether or not ADIA or PSI under the corporate veil theory would have paid that amount up front.*" (Doc. 180 at 11).

**6.** Plaintiffs' present counsel also represented them in *Professional Service Industries, Inc. v. Kimbrell*.

that when we, in the subsequent meeting in Lawrence, Kansas, those concerns were strengthened which caused us to lower our offer slightly.

(Doc. 176, Ex. H at 28).

The court fails to see how ADIA's initial negotiation allowance of up to $35 million for Hall–Kimbrell is evidence that PSI, with ADIA's authorization, would have paid the $8 million up front (or, for that matter, any amount more than it agreed to pay in the SPA). Paternot testified that the board authorized this maximum negotiation amount for Hall–Kimbrell *before* it received Hall–Kimbrell's results for 1989 or projections for 1990. David Kimbrell testified in his own deposition that David Ahlberg, PSI's primary negotiator for the purchase of Hall–Kimbrell, initially offered him $30 million for Hall–Kimbrell,[7] but that:

> At the time when he offered the 30 million dollars, he nor I had privy to the previous month's financial statements because they normally come out five weeks after the last month. So, we only had good financial statements through September, I believe. *And a lot happened from that meeting in the bar until finally we had a meeting to arrive on a price.* And, primarily, that is we got ahold of October financial statements and a projection for November that showed tremendous losses. And we had to face reality and they had to face reality.

(Doc. 170, Ex. G at 104–05) (emphasis added).

In short, it is undisputed that the circumstances had materially changed from the time ADIA's board of directors initially authorized the $35 million negotiation figure to the time PSI and the Kimbrells hammered out a final purchase price. Using the $35 million figure as evidence of what ADIA or PSI was willing to pay by the time an actual agreement was reached is clearly contrary to the undisputed evidence, as well as the terms of the SPA. Plaintiffs must produce evidence that PSI would have agreed to forego adjusting the anticipated discrepancies in Hall–Kimbrell's financial statements through

use of a contingent payment. *See PSI v. Kimbrell,* 834 F.Supp. at 1302–03. Plaintiffs have not produced such evidence. David Kimbrell himself testified, ". . . all I know is that this is just PSI's way of doing merger, is to let all the assets and liabilities shake out rather than having speculation on each one of them." (Doc. 170, Ex. G at 34). This evidence remains undisputed. The court concludes that the Kimbrells' claim that but for ADIA's misrepresentations they would have received the $8 million payment up front is unsupported and insufficient to show the first element of causation.

■ Plaintiffs also have not shown the second element of causation, that ADIA's alleged promises proximately caused the loss of the $8 million. Not all losses that in fact result from reliance on false statements or promises are recoverable. *See* Restatement (Second) of Torts, § 548A (1977). One may recover only those losses which are reasonably foreseeable. *Id.,* Comment a at 107.

Assuming plaintiffs' allegations of false representations are true, there is no evidence of a causal link between the presale promises and the loss of the post-sale $8 million second payment. PSI's refusal to pay anything for the second payment was because of its post-sale conclusion that Hall–Kimbrell's liabilities exceeded the specified additions. ADIA, as noted above, had no part in PSI's determination. There is no evidence that ADIA knew or should have known what PSI would do with the second payment provision. Indeed, the undisputed evidence is that *no one* knew how the second payment would shake out. Further, after the sale was complete, the Environmental Protection Agency filed complaints against Hall–Kimbrell, apparently provoking PSI's decision to pay nothing under the second payment provision. There simply is no logical causal relationship between the alleged false presale promises and the post-sale decision that no second payment was due.

---

**7.** David Kimbrell turned down this initial offer of $30 million, stating he wanted $40 million minimum for the company. (Doc. 170, Ex. G at 104).

### B. *ADIA's Other Arguments*

In light of this ruling, the court will not reach ADIA's argument that plaintiffs' claim to the $8 million is speculative or that the plaintiffs' claims are barred by their settlement with PSI.

IT IS ACCORDINGLY ORDERED that defendant ADIA's motion for partial summary judgment, (Doc. 170), is GRANTED.