MPROVE, et al., Appellants–
Respondents,

v.

**KLT TELECOM, INC., et al., Copier Solutions and Telemetry Solutions, LLC, Respondents–Appellants.**

**Nos. WD 61406, WD 61416, WD 61442.**

Missouri Court of Appeals,
Western District.

April 6, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 1, 2004.

Nicholas L. Divita, Kansas City, MO, for appellants-respondents.

John M. Kilroy, Jr., William J. Foland, Jr., Kansas City, MO, for respondents-appellants.

Before JOSEPH M. ELLIS, Chief Judge, ROBERT G. ULRICH, Judge and RONALD R. HOLLIGER, Judge.

JOSEPH M. ELLIS, Chief Judge.

This is a consolidated appeal from a judgment of the Circuit Court of Jackson County entering an award of damages in the amount of $725,000 on a jury verdict in favor of plaintiff Mprove Inc. on its fraudulent misrepresentation claims against defendant KLT Inc. Plaintiff and defendants[1] both appealed the circuit court's judgment, and we consolidated the two appeals.[2] We reverse the judgment in favor of Mprove Inc. and also find against Mprove Inc. on the issues raised in its appeal.

### Introduction

This case has a long and complex factual history. The record before us is extreme-

---

1. In addition to KLT Inc., three other defendants below (KLT Telecom Inc., Telemetry Solutions LLC, and Copier Solutions LLC) filed notices of appeal. Mprove Inc. has filed a motion (which we took with the case) to dismiss their appeals for lack of standing under § 512.020, RSMo 2000, arguing that inasmuch as the trial court disregarded their corporate separateness from KLT Inc. (and from each other), they were not "aggrieved" by the $725,000 monetary judgment against KLT Inc. For reasons which will become apparent later in this opinion, Mprove's motion is denied as moot.

2. Pursuant to Rule 84.04(j), we designated the plaintiff below (Mprove Inc.) as Appellant-Respondent in the consolidated appeal. Likewise, we designated each of the appealing defendants below (KLT Inc., KLT Telecom Inc., Telemetry Solutions LLC, and Copier Solutions LLC) as a Respondent-Appellant in the consolidated appeal.

ly large: the transcript alone is eleven volumes and 1,950 pages, not to mention the extensive legal file and a vast number of exhibits. A detailed recitation of all the events involved would be lengthy, and, in light of our disposition of the appeals, confusing. It suffices to say that the business dealings of several key individuals and the four defendant companies, all of whom will be identified and discussed *infra*, were intertwined in many ways leading up to, at the time of, and subsequent to Mprove, Inc.'s predecessor's sale of its assets to Copier Monitoring Solutions, LLC, through and including the eventual default on that purchase and repossession of the assets. The sale and default led to the filing of this action, and because of the various relationships between and among the four defendant companies, they were all named as defendants by the plaintiff company. As will be seen, however, those complicated and convoluted details are unnecessary to our resolution of this case. Accordingly, we will not lengthen this opinion by inserting that factual detail, but to the extent that additional facts beyond those contained in the following summary are necessary to understand our decision, they will be included in our analysis.

### Factual Summary

At all times relevant to this appeal, KLT, Inc. ("KLT") was a wholly-owned subsidiary of Kansas City Power & Light Company ("KCP & L"). KLT was formed in 1992 as an entity through which KCP & L could pursue business opportunities in fields that were outside the scope of a conventional, heavily-regulated utility company. Acting as a holding company, KLT formed various wholly-owned subsidiaries to further its mission, including KLT Telecom, Inc. ("KLT Telecom").[3] KLT Telecom was created in 1995 to invest in unregulated telecommunications ventures and businesses for the purpose of increasing shareholder value.

One of KLT Telecom's investments took the form of Telemetry Solutions, LLC ("TS"), a Delaware limited liability company that was formed in 1997. TS's business purpose was to invest in various telemetry and remote monitoring applications. In late 1998, among other entities, TS was invested in Copier Solutions, LLC ("CS"), which represented about 10% of TS's business efforts. CS, a Missouri limited liability company formed in May 1998, was involved in the electronic copy machine monitoring business.

CS was brought to the attention of TS by a man named Colin Dobell. Throughout 1998 and for most of 1999, Mr. Dobell was a one-third owner of TS,[4] a member of the Management Committee of TS, and the manager of both TS and CS. As manager of TS and CS, Mr. Dobell was directly and personally responsible for their day-to-day business activities.

Toward the end of 1998, Mr. Dobell presented a business plan to the Management Committee of TS for the acquisition of Mprove, Inc., which was then known as

---

3. Besides KLT Telecom, KLT had five other direct subsidiaries: KLT Power (generation of electricity), KLT Gas (exploration for and production of natural gas), KLT Energy Services (energy audits and purchase and sale of electricity), KLT Investments Inc. (affordable housing projects), and KLT Investments II, Inc. (local real estate and other Kansas City-related venture capital investments).

4. Until December 31, 1999, KLT Telecom held the other two-third ownership interest in TS. Prior to January 1999, KLT Telecom authorized loans to TS on a quarterly basis. Beginning in January 1999, the loans were authorized by KLT Telecom on a monthly basis.

Copycomm, Inc. ("Copycomm").[5] Owned by Frank Groenteman, Copycomm was involved in the development of remote metering systems for the copier industry. Mr. Groenteman personally held two registered patents related to copier monitoring technology. One patent related to wireless (radio frequency or RF) spread-spectrum technology, while the other related to electronic circuitry which permitted digital information to be extracted from a copier or fax machine and transmitted to a wired monitoring device. Copycomm initially focused its efforts on the development of a wireless remote metering unit. This product turned out to be too expensive for its intended market, so Copycomm developed a less complicated, hard-wired unit called the Meter Minder.

In October 1998, Mr. Dobell began negotiations with Mr. Groenteman for a sale of Copycomm's assets, and they ultimately reached a tentative agreement. Mr. Groenteman testified that during these negotiations, Mr. Dobell and Mr. Charles Hawley, Vice–President of Sales for CS, told him that KLT would be financially supporting the proposed purchase of Copycomm's assets.[6] In addition to the sale of the assets of Copycomm, Mr. Dobell and Mr. Hawley expressed interest in licensing Mr. Groenteman's wireless technology-related patent. Mr. Groenteman testified that, during the negotiations with Mr. Dobell and Mr. Hawley, he made it clear that this patent was not part of Copycomm's assets but would have to be acquired as part of a package deal involving both, because he was unwilling to separate them.

The negotiations between Mr. Groenteman, Mr. Dobell and Mr. Hawley resulted in an agreed-upon purchase price of $950,000 for the Copycomm assets and $100,000 for an exclusive license on the wireless technology-related patent. The purchase price for the Copycomm assets was to be paid in a series of unequal installments spread over three years, while the price for the exclusive license on the wireless technology-related patent was to be paid in four equal quarterly installments of $25,000, followed by a yearly royalty payment of $10,000. In addition, it was agreed that the asset purchase transaction would be non-recourse, so that in the event of nonpayment by the purchaser, Copycomm's exclusive remedy would be the return of its former assets. On November 16, 1998, a letter of intent was executed, which set forth the gist of the terms of the deal and indicated that a yet-to-be-created "Newco" (*i.e.*, new company), wholly owned by CS, would enter into the contract for the purchase of Copycomm's assets.

In December 1998, Mr. Dobell presented the proposed Copycomm deal to the TS Management Committee and the KLT Telecom Board of Directors. Ultimately, neither the KLT Telecom Board nor TS agreed to the purchase, although the Board did decide to approve an advance of funds to acquire the wireless technology-related patent license. Mr. Dobell, however, still thinking the purchase would be a good investment, proceeded to form a new Missouri limited liability company, Copier Monitoring Systems, LLC ("CMS"), of which he was the sole member, and entered into a contract with Copycomm for the purchase based on the same terms and conditions previously negotiated. The contract was signed by Mr. Groenteman on

---

**5.** For sake of clarity, we will refer to Mprove, Inc. and Copycomm, Inc. as Copycomm throughout the remainder of this opinion.

**6.** These representations were untrue, as neither KLT, KLT Telecom, TS, nor CS had agreed to fund, "back," or otherwise financially support the proposed asset purchase.

behalf of Copycomm on December 22, 1998.

In their negotiations, the parties had agreed on the sale being non-recourse, and the contract provided as much. In Section 7.2(a), entitled "Remedies upon Default," the contract stated, in bold print:

> [I]n the event that the Purchaser fails to make the payments for the Assets as set forth in Schedule 2.2, the Seller agrees that its sole and exclusive remedies shall be recourse to the Assets pursuant to its security interest under the Security Agreement (see form at Exhibit A) to be entered into between the Purchaser and Seller on the Closing Date.[7]

Mr. Groenteman understood that Section 7.2(a) was an exclusive remedy provision and also knew that, if for any reason the buyer was unwilling or unable to make the installment payments, the buyer could terminate the contract by returning the assets and that the seller would not have to return any payments it had already received.

The asset purchase contract called for a total of $950,000 to be paid in installments on the following schedule: $75,000 on the closing date; $75,000 on March 31, 1999, June 30, 1999, and September 30, 1999; $150,000 on December 31, 1999; and $250,000 on December 31, 2000, and December 31, 2001. The Exclusive License Agreement on the wireless technology-related patent was to be paid by CS in four equal quarterly installments of $25,000 on the closing date, March 31, 1999, June 30, 1999, and September 30, 1999, followed by a yearly royalty payment of $10,000.

The required payments on the asset purchase contract were made through the June 30, 1999 payment date, and all four payments were timely made on the Exclusive License Agreement.[8] Mr. Dobell failed to make the September 30, 1999 payment on the asset purchase agreement and defaulted on all payments to be made thereafter. Mr. Groenteman received Copycomm's assets back and this action followed.

### Procedural History

Copycomm subsequently filed the present action in the Circuit Court of Jackson County. Copycomm proceeded to trial on a ten-count petition—Count I: Tortious Interference with Contract, Business Expectancy, and Prospective Economic Advantage; Count II: Fraud in the Inducement; Count III: Actual and Constructive Fraud and Negligent and Intentional Misrepresentation; Count IV: Breach of Contract; Count V: Violation of the Missouri Uniform Trade Secrets Act ("UTSA"); Count VI: Conversion and Malicious Trespass; Count VII: Unjust Enrichment; Count VIII: Violation of the Missouri Uniform Fraudulent Transfer Act ("UFTA"); Count IX: Breach of Implied Duty of Good Faith and Fair Dealing; and Count X: Punitive Damages.

---

7. Likewise, Section 7(a) of the security agreement accompanying the asset purchase contract between CMS and Copycomm, under the heading "Remedies Upon Default," provided that in the event CMS failed to fulfill its contractual obligations, "Copycomm agrees that its sole and exclusive remedy ... is the right to obtain the Collateral as specified in this section 7(b) below." Section 7(b) provided that upon default, CMS was required, "at its expense and upon request by Copycomm," to "forthwith assemble all or part of the Collateral as directed by Copycomm and make it available to Copycomm at a place to be designated by Copycomm which is reasonably convenient to both parties."

8. After making the fourth payment, CS terminated the exclusive license arrangement and returned all licensing rights to the wireless technology-related patent to Mr. Groenteman.

After resting its case, Copycomm voluntarily withdrew its claims for constructive fraud and negligent misrepresentation, violation of the UTSA, conversion, unjust enrichment, violation of the UFTA, and breach of the implied duty of good faith and fair dealing. In addition, Mr. Groenteman, who was named as a plaintiff when the trial began, withdrew all claims he had asserted in his individual capacity.

After Copycomm rested its case, the trial court considered the defendants' motions for a directed verdict. The trial court granted the defendants' motions for a directed verdict on Copycomm's claim for tortious interference with contract, citing only Copycomm's "failure to make a case," and denied the motions on all other claims.

The case was ultimately submitted to the jury on the following claims: (1) fraudulent misrepresentation by KLT; (2) malicious or wanton damage by KLT to Copycomm's security interest in the Copycomm assets sold to CMS;[9] and (3) breach of contract by CMS.[10] The jury returned a verdict in favor of Copycomm on the fraudulent misrepresentation claims and awarded $725,000 in damages.[11] On the claim for malicious or wanton damage to or interference with Copycomm's security interest, the jury found in favor of KLT. The jury also returned a verdict in favor of

CMS on Copycomm's breach of contract claim.

KLT and KLT Telecom timely filed a motion for judgment notwithstanding the verdict or for new trial. In that motion, KLT and KLT Telecom argued, among other things, that the trial court erred in failing to direct a verdict on Copycomm's fraudulent misrepresentation claims and in its decision to pierce the corporate veil of subsidiary companies in order to reach KLT's assets. The trial court denied the motion for judgment notwithstanding the verdict or for new trial in its entirety, and this appeal followed.

### KLT's Appeal

We address KLT's appeal first. Before doing so, however, a brief explanation of Copycomm's fraudulent misrepresentation claims is in order. Copycomm's theory was that KLT was the alter-ego of KLT Telecom, TS, and CS, and was therefore liable for their tortious acts. Copycomm submitted two separate fraudulent misrepresentation claims to the jury. The essence of the first claim was that prior to the sale of Copycomm's assets, one or more defendants falsely represented to Copycomm or its attorney, Robert Curfiss, that KLT would financially support the entity purchasing the Copycomm assets, intending that Copycomm rely on that representation. This false representation, the

9. The gist of this claim was that between the date Copycomm's assets were sold to CMS and the date CMS failed to make its fourth scheduled payment to Copycomm, one or more defendants substantially impaired the ability of CMS to return all of the assets to Copycomm in the event of nonpayment as provided in the security agreement, that these actions were wanton and malicious, and that they either directly caused damage to Copycomm or combined with the acts of other defendants to cause damage to Copycomm.

10. The thrust of this assertion was that CMS breached the asset purchase contract by not returning all the assets to Copycomm after failing to make its fourth scheduled payment to Copycomm.

11. Both parties have observed that this is exactly the amount of additional money Copycomm would have received from CMS had CMS chosen to make all the payments described in the asset purchase contract rather than exercising its option to terminate the contract after making three $75,000 payments.

claim continues, was material to Copycomm's decision to sell its assets to CMS, Copycomm reasonably relied on the false representation in selling its assets to CMS, and as a direct result of the false representation, Copycomm was damaged.

The gist of the second claim was that prior to the sale of Copycomm's assets, one or more defendants falsely represented to Copycomm or Mr. Curfiss that KLT or one of its direct or indirect subsidiaries would own the entity purchasing the Copycomm assets, intending that Copycomm rely on that representation. This false representation, the claim continues, was material to Copycomm's decision to sell its assets to CMS, Copycomm reasonably relied on the false representation in selling its assets to CMS, and as a direct result of the false representation, Copycomm was damaged. The damage instruction for both of these claims was modeled on MAI 4.01: "If you find in favor of Copycomm, then you must award Copycomm such sum as you believe will fairly and justly compensate Copycomm for any damages you believe Copycomm sustained as a direct result of the conduct of one or more defendants as submitted in [the verdict directors described above]."

■ In its second point, which is dispositive of its appeal, KLT argues that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict because Copycomm's fraudulent misrepresentation claims should not have been submitted to the jury and failed as a matter of law in that Copycomm presented insufficient evidence for the jury to determine whether and in what amount it was damaged. We agree.

■ A defendant's motion for judgment notwithstanding the verdict "presents the same question as a motion for directed verdict at the close of all the evidence; *i.e.*, whether the plaintiff made a submissible case." *Sch. Dist. of Independence v. U.S. Gypsum Co.*, 750 S.W.2d 442, 445–46 (Mo.App. W.D.1988). "A case should not be submitted to the jury 'unless each and every fact essential to liability is predicated upon legal and substantial evidence.'" *Kenney v. Wal–Mart Stores*, 100 S.W.3d 809, 814 (Mo. banc 2003) (quoting *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 615 (Mo. banc 1995)). In determining whether a plaintiff has made a submissible case, we view the evidence in the light most favorable to the plaintiff, presume the plaintiff's evidence is true, and give the plaintiff the benefit of all reasonable and favorable inferences to be drawn from the evidence. *Eidson v. Reprod. Health Servs.*, 863 S.W.2d 621, 626 (Mo.App. E.D.1993). However, no fact essential to submissibility may be inferred in the absence of a substantial evidentiary basis. *Probst v. Seyer*, 353 S.W.2d 798, 802 (Mo.1962). "[W]e do not supply missing evidence or give the plaintiff the benefit of unreasonable, speculative, or forced inferences. The evidence and inferences must establish every element and not leave any issue to speculation." *Davis v. Bd. of Educ. of City of St. Louis*, 963 S.W.2d 679, 684 (Mo.App. E.D.1998) (internal citation omitted). "In other words, liability cannot rest upon guesswork, conjecture or speculation beyond inferences reasonably to be drawn from the evidence." *Probst*, 353 S.W.2d at 802.

■ The elements of the common law tort of fraudulent misrepresentation are:

1) a false, material representation; 2) the speaker's knowledge of its falsity or his ignorance of its truth; 3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; 4) the hearer's ignorance of the falsity of the representation; 5)

the hearer's reliance on its truth; 6) the hearer's right to rely thereon; and 7) the hearer's consequent and proximately caused damages.

*Misischia v. St. John's Mercy Med. Ctr.,* 30 S.W.3d 848, 868 (Mo.App. E.D.2000). A plaintiff's "failure to establish any one of these elements of fraud is fatal to recovery." *Slone v. Purina Mills, Inc.,* 927 S.W.2d 358, 371 (Mo.App. W.D.1996)·(citing *Heberer v. Shell Oil Co.,* 744 S.W.2d 441, 443 (Mo. banc 1988)). As noted earlier, KLT's second point on appeal challenges the sufficiency of plaintiff's proof as to the last element—the cause and amount of Copycomm's damages.

To prevail under its theory of the case, Copycomm had to show not only that KLT's representations were fraudulent, but also that they were the direct and proximate cause of its alleged pecuniary loss. *Collins v. Adams Dairy Co.,* 661 S.W.2d 603, 605 (Mo.App. E.D.1983). As our Supreme Court has put it:

> In order for a false representation to be actionable, there must exist a causal connection between the misrepresentation and the harm allegedly sustained. It must appear in an appreciable sense that the damage flowed from the fraud as the proximate and not the remote cause, and the damage must be such as is the natural and probable consequence of the fraud.

*Heberer,* 744 S.W.2d at 443–44 (internal citations and quotation marks omitted).

"Proximate cause is commonly defined by the courts as that cause that, in a natural and continuous sequence, unbroken by any efficient intervening cause, produced the result complained of, and without which the result would not have occurred." *Kilmer v. Mun,* 17 S.W.3d 545, 551–52 n. 19 (Mo. banc 2000). "Proximate cause cannot be based on pure speculation and conjecture." *Stanley v. City of Inde-*

*pendence,* 995 S.W.2d 485, 488 (Mo. banc 1999). "If the evidence leaves the element of causal connection in the nebulous twilight of speculation, conjecture and surmise, plaintiff's burden is not met." *Oldaker v. Peters,* 869 S.W.2d 94, 100 (Mo. App. W.D.1993).

Copycomm's brief does not clearly explain its theory of causation. Viewing the evidence at trial on that issue in the light most favorable to Copycomm, as best we can tell, "the result complained of" by Copycomm is its failure to be paid the full $950,000 it hoped to receive from CMS under the asset purchase contract. As correctly noted by KLT, the problem with this contract-based theory of causation is that according to the precise, clear, and unambiguous terms of the non-recourse contract in question, Copycomm was in no way guaranteed to receive even the $225,000 it did, much less the remaining $725,000. This is due to the fact that CMS was legally entitled to terminate the contract *at any time it wished* simply by declining to make further payments and returning the assets to Copycomm upon foreclosure by Copycomm as specified in the security agreement. Under such circumstances, there could be no reasonable, legally-enforceable expectation on the part of Copycomm that the contract would proceed to full maturity, because by entering into a contract which could be terminated without its authorization or consent, Copycomm bargained for termination at any time subject only to its right to foreclose on the assets. *See, e.g., United Mo. Bank v. Beard,* 877 S.W.2d 237, 243 (Mo.App. W.D.1994) (describing the effect of a note which expressly authorized the maker to submit full or partial prepayment at any time without consent of the holder); *Laclede Inv. Corp. v. Kaiser,* 596 S.W.2d 36, 39, 44 (Mo.App. E.D.1980) (describing the effect of a non-guaranteed, non-recourse

loan agreement providing that the exclusive remedy for nonpayment was foreclosure of the security interest).

Since Copycomm contracted to receive periodic installments on a non-guaranteed, non-recourse basis, Copycomm was not assured of receiving payments totaling $950,000 from CMS—and this is true *regardless* of any representations made by KLT.[12] That is to say, CMS would still have had the legal right to terminate the contract at the time it did, without regard to whether KLT actually owned or financially supported CMS.

Copycomm therefore failed to prove that the misrepresentations began or were part of a natural, continuous, and unbroken sequence of events which resulted in its failure to receive an additional $725,000 in future installment payments from CMS. Moreover, Copycomm failed to prove that the result complained of would not have occurred without or "but for" those misrepresentations. In other words, Copycomm did not meet its burden to prove that its failure to be paid the full $950,000 was caused by the misrepresentations.

Seeking to avoid this result, Copycomm argues, as it did to the jury during closing argument, that KLT fraudulently induced Copycomm to offer contract terms different from those it would have offered had it known the true state of affairs. In particular, Copycomm points to the following trial testimony of Mr. Groenteman:

> If I had known that Copier Monitoring Systems was owned by Colin Dobell and nobody else and had no funding or no

backing from KLT, that is quite a different risk and I probably would have said to Collin, hey, I will still maybe do a deal with you, I am not denying that, but instead of having the payments over three years as they were spread out, I would have said I want 85 percent of it now and 5 percent every year for the next three years and that would have been a different decision I could have made at the time but because I didn't have that information I couldn't make that decision.

▮ To be sustainable on appeal, however, a damage award must be based on evidence more tangible than " 'a gossamer web of shimmering speculation and finely-spun theory.' " *Delgado v. Mitchell*, 55 S.W.3d 508, 512 (Mo.App. S.D.2001) (quoting *Carmel Energy, Inc. v. Fritter*, 827 S.W.2d 780, 783 (Mo.App. W.D.1992)). The testimony of what Mr. Groenteman "probably would have said" to Mr. Dobell falls far short of proving that KLT's misrepresentations caused Copycomm to suffer *any* loss, let alone the $725,000 loss found by the jury.

Although the parties did not cite and we were unable to find a case directly on point,[13] KLT does discuss *Kimbrell v. ADIA*, 929 F.Supp. 373 (D.Kan.1996), a case involving a fraudulent inducement claim similar to that made by Copycomm here. In *Kimbrell*, the plaintiffs owned a majority interest in an environmental consulting company called Hall–Kimbrell Environmental Services, Inc. ("Hall–Kim-

---

**12.** Indeed, Mr. Groenteman himself testified that Copycomm would have entered into exactly the same type of non-recourse, non-guaranteed transaction with a subsidiary of CS as it did with CMS.

**13.** Our Supreme Court has noted that in deciding questions of proximate cause, "each case must be decided on its own facts, and it

is seldom that one decision controls another." *Krause v. U.S. Truck Co.*, 787 S.W.2d 708, 710 (Mo. banc 1990). For this reason, the Court in *Krause* observed that determining whether a defendant's conduct is the proximate cause of a plaintiff's injury can be "exasperating." *Id.; see also Van Vacter v. Hierholzer*, 865 S.W.2d 355, 358 (Mo.App. W.D.1993).

brell"). *Id.* at 374. They sold their ownership interest in Hall Kimbrell to Professional Service Industries ("PSI"), a subsidiary of the defendant, ADIA. *Id.* In addition to other payments due at closing, the stock purchase agreement between PSI and Hall–Kimbrell provided for a contingent second payment to be made to Hall–Kimbrell's stockholders after closing, of which the plaintiffs would receive their pro rata share. *Id.* The stock purchase agreement did not recite a specific amount for the second payment; PSI was to calculate that figure by offsetting against certain of Hall–Kimbrell's liabilities at the end of the review period an additional $8 million of the purchase price and Hall–Kimbrell's cash and collected amounts after a specified period of time. *Id.* at 374–75. "During the review period, PSI determined that Hall–Kimbrell's liabilities exceeded the specified additions and calculated that no additional money was due under the second payment provision." *Id.* at 375. The plaintiffs then sued ADIA, claiming that representatives of both ADIA and PSI had fraudulently induced them to sell their majority interest in Hall–Kimbrell to PSI. *Id.* Plaintiffs alleged that during the negotiation process, ADIA and PSI had made several false representations to them, including, among other things, that ADIA would infuse Hall–Kimbrell with $10 million in working capital. *Id.* at 376–77. Plaintiffs further alleged that had they known these representations were false, they would not have agreed to the contingent payment language in the stock purchase agreement with PSI but instead would have demanded their pro rata share of the additional $8 million "up front." *Id.* at 376, 377, 378.

ADIA moved for summary judgment on the limited issue of whether the plaintiffs were entitled to seek recovery of their pro rata share of the contingent $8 million

second payment under the stock purchase agreement. *Id.* at 377. In support of the motion, ADIA argued, among other things, that plaintiffs had failed to show that ADIA's alleged misrepresentations proximately caused the loss of their pro rata share of the contingent $8 million second payment. *Id.*

The court granted summary judgment to ADIA, *id.* at 380, holding that the plaintiffs had failed to show the required causal connection between the alleged misrepresentations and the harm allegedly sustained. *Id.* at 378–79. Among other things, the court explained its holding as follows: "[P]laintiffs have not provided any evidence that they could have successfully demanded the $8 million up front. They have not produced evidence indicating that PSI would have considered a contract that did not include a contingent second payment provision." *Id.* at 378. The court also observed that plaintiffs had failed to prove that PSI would have agreed to pay *any* amount more up front than it actually did under the terms of the stock purchase agreement, not to mention $8 million more. *Id.* at 379.

Like the plaintiffs in *Kimbrell*, Copycomm claims it would have acted differently during the contract negotiation process if it had it known of KLT's false representations. In particular, Copycomm presented evidence that during the contract negotiations in December 1998, Mr. Groenteman would have asked for much more money "up front" if he knew then that CMS was owned by Colin Dobell and was not funded by KLT. However, also like the plaintiffs in *Kimbrell*, Copycomm presented no evidence that it could have successfully demanded and received any more money "up front" from the party with whom it negotiated the contract. In particular, Copycomm offered no evidence that CMS would have paid any more mon-

ey "up front" or agreed to enter into an asset purchase contract with Copycomm under the terms referred to in Mr. Groenteman's testimony. Moreover, the undisputed evidence presented at trial by witnesses from both sides made it abundantly clear that Copycomm was well aware that the entity acquiring its assets would be a yet-to-be-formed "Newco." Although CopyComm was misled into believing that the Newco would be owned and funded by KLT, it also knew that neither KLT, KLT Telecom, TS, nor CS would guarantee any financial obligations under the asset purchase contract. Mr. Groenteman also knew that the asset purchase contract was non-recourse, that the exclusive remedy for nonpayment of an installment was to foreclose under the security agreement and demand the return of the assets, and that the owner of the newly-formed company would not be personally liable on the contract. To now say that had it known that CMS "had no funding or no backing from KLT," Copycomm would have been successful in demanding more cash from CMS "up front," flies in the face of these facts.

To put it another way, without resorting to impermissible speculation and conjecture, the jury had no way to determine whether, had Copycomm known that CMS was owned by Colin Dobell and would not receive any financial backing from KLT, Copycomm would have been able to successfully negotiate a different contract with CMS under which it was guaranteed to receive more than $225,000. Likewise, Copycomm adduced no evidence that there was another willing buyer who, in December 1998 or any point thereafter, would have agreed to purchase the Copycomm assets at any price under any terms, much less a guaranteed figure in excess of the $225,000 Copycomm ultimately received under the terms of the asset purchase contract with CMS. Thus, even under a fraudulent inducement theory, there was still an insufficient factual and logical basis to support a finding of causation.[14]

Simply stated, Copycomm failed to prove that, but for KLT's misrepresentations as to the ownership and financial support of CMS, Copycomm would have ended up in any other position than it did. *See Walker Mobile Home Sales v. Walker*, 965 S.W.2d 271, 277 (Mo.App. W.D.1998) (holding that where the plaintiff "was in the same position he would have been in had [defendant] not made the purported misrepresentation," the plaintiff failed to establish that he suffered any damages and, therefore, did not establish the requisite elements of fraud).

■ To summarize, we hold that, as a matter of law, Copycomm did not meet its burden to establish a reasonably certain causal connection between KLT's misrepresentations and the damages Copycomm claims to have sustained. The trial court, therefore, erred in overruling KLT's motion for judgment notwithstanding the verdict because, when a defendant's motion for judgment notwithstanding the verdict correctly identifies one or more required elements of the plaintiff's case which are not supported by the evidence, the motion should be granted. *Sch. Dist. of Independence*, 750 S.W.2d at 446.[15]

---

14. Of course, had this case involved a false representation that KLT would *guarantee* payment under the asset purchase contract with CMS, the situation would be much different.

15. In light of our disposition of KLT's second point relied on, we need not address its other points and subpoints, in which KLT argues that the trial court erred in piercing the corporate veil, that Copycomm failed to prove reasonable reliance and a duty to disclose, and that the trial court erred in refusing to submit KLT's proposed agency instruction to the jury.

## Copycomm's Appeal

We turn now to Copycomm's appeal. Copycomm argues on appeal that the trial court erred in directing a verdict against Copycomm on its claim against KLT for tortious interference with contract under the rule stated in § 766A of the *Restatement (Second) of Torts* in that Copycomm made a *prima facie* case under that provision and Missouri courts should recognize such a cause of action.[16]

When reviewing a directed verdict granted in favor of a defendant, we view the evidence and permissible inferences in the light most favorable to the plaintiff, disregard contrary evidence and inferences, and determine whether, on the evidence so viewed, plaintiff made a submissible case. *Ozark Employment Specialists, Inc. v. Beeman*, 80 S.W.3d 882, 892 (Mo.App. W.D.2002). Where, as here, the grant or denial of a directed verdict is based upon a conclusion of law, this court reviews the trial court's decision *de novo. Id.* at 889.

Stated in the light most favorable to Copycomm, the evidence was that prior to entering into the asset purchase contract with CMS on December 22, 1998, Copycomm had a non-exclusive marketing and sales contract with a company called MeterLogic (then known as CopyTrak), under which Copycomm's remote monitoring hardware would be paired and marketed with MeterLogic's monitoring service. Although KLT was not a party to the contract between Copycomm and MeterLogic, KLT knew about their business relationship and had been faxed an unexecuted copy of the Copycomm–MeterLogic contract by Mr. Groenteman on December 10, 1998. KLT wanted the benefits of that preexisting business relationship by succeeding to the interest of Copycomm in the Copycomm assets, which would neutralize the only credible competitor in monitoring by denying the competition the ability to bundle the Copycomm copier interface with a data collection engine. In its brief, Copycomm argues that because KLT fraudulently induced Copycomm to part with its assets and agree not to compete with CMS in the copier monitoring business, Copycomm was prevented from performing and receiving the financial benefits of its own contract with MeterLogic "as surely as if [KLT] had bound and gagged Copycomm."

Ordinarily, the plaintiff in a tortious interference action is a party who claims he has been deprived of the other party's performance by reason of the improper conduct of a third person. Analytically, this is a situation where A may be liable to B for causing C not to perform a contract between B and C. *See* MAI 23.11 & n. 2; *Downey v. United Weatherproofing, Inc.*, 363 Mo. 852, 253 S.W.2d 976, 980 (1953). Section 766A ("Intentional Interference with Another's Performance of His Own Contract") of the *Restatement (Second) of Torts* (1979), however, recognizes that the plaintiff may also be the party who was prevented from performing:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another [the plaintiff] and a third person, by preventing the other [the plaintiff] from performing the contract or causing his performance to be more expensive or burdensome, is sub-

---

16. Due to our resolution of KLT's second point relied on, Copycomm's first and second points, in which Copycomm argues that the trial court erred in denying its claim for an additional $200,000 in prejudgment interest on the $725,000 damage award and in directing a verdict in favor of KLT on Copycomm's claim for punitive damages, are moot.

ject to liability to the other [the plaintiff] for the pecuniary loss resulting to him. This section deals with the situation where A may be liable to B for preventing B from performing a contract between B and C, or by making the contract's performance more expensive or burdensome. With commendable candor, Copycomm concedes in its brief that no appellate court has ever recognized or adopted § 766A as a valid cause of action in tort in Missouri.[17] It nevertheless urges us to find that the trial court erred in refusing to recognize it as a new cause of action in Missouri, citing decisions from several states whose courts have expressly adopted § 766A. While a fair number of other courts and respected legal commentators have expressed a contrary view on the merits of § 766A,[18] we need not decide whether to embrace or reject the cause of action stated in § 766A because, even if we did recognize it, Copycomm would still be unable to recover under the circumstances presented in this case.

In *Alfano v. AAIM Management Ass'n*, 770 S.W.2d 743 (Mo.App. E.D.1989), plaintiff Alfano quit his job with Control Data Corporation ("CDC") in anticipation of employment with the defendant AAIM, which had offered him a position. *Id.* at 744. Defendant subsequently either withdrew the job offer it had previously made or fired plaintiff. *Id.* Plaintiff then sued the defendant for breach of its employment

contract with him, as well as for tortious interference with the employment contract between the plaintiff and CDC. *Id.* The trial court granted summary judgment to defendant on both claims, and plaintiff appealed. *Id.* at 745. Plaintiff contended on appeal that the trial court erred in granting summary judgment on his claim for tortious interference with contract since he had stated a cause of action under § 766A. *Id.* at 746. Although it did not adopt § 766A and could find no Missouri cases addressing the issue, the Eastern District cited *Furlev Sales & Associates, Inc. v. North American Automotive Warehouse, Inc.*, 325 N.W.2d 20, 27 (Minn.1982) for its holding that "a plaintiff who is 'prevented' from performing his contract because he has entered into an agreement with a third party not to perform cannot recover against that third party for tortious interference with contract" under § 766A. 770 S.W.2d at 746. Applying *Furlev*, the Eastern District proceeded to explain that since plaintiff Alfano "voluntarily terminated his employment with CDC either in anticipation of his employment with defendant or as part of an employment agreement with defendant," he was precluded from recovering against defendant. *Id.* The court concluded its analysis by observing that the Minnesota view "appears to be the prevailing one and we believe it should be followed in Missouri." *Id.* Accordingly, the Eastern District affirmed the grant of

17. Copycomm correctly observes that in 1984, the Southern District declined to decide whether to do so. *Minn. Mining & Mfg. v. Williamson*, 675 S.W.2d 951, 957 n. 1 (Mo. App. S.D.1984). More recently, the same court implicitly rejected such a cause of action, albeit without citing § 766A. *Birdsong v. Bydalek*, 953 S.W.2d 103, 112 (Mo.App. S.D. 1997); *see also St. Louis Convention & Visitors Comm'n v. Nat'l Football League*, 154 F.3d 851, 865 (8th Cir.1998) (noting the absence of any Missouri authority recognizing the theory of recovery set forth in § 766A).

18. Although not an exhaustive list, see *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 662–63 & n. 12 (3d Cir.1993); *Koehler v. County of Grand Forks*, 658 N.W.2d 741, 748 (N.D.2003); *CMI, Inc. v. Intoximeters, Inc.*, 918 F.Supp. 1068, 1079–80 (W.D.Ky.1995); *Price v. Sorrell*, 784 P.2d 614, 615–16, 619–20 (Wyo.1989); 2 DAN B. DOBBS, THE LAW OF TORTS § 448 (2001); and PROSSER AND KEETON ON THE LAW OF TORTS § 129, at 979 (W. Page Keeton ed., 5th ed.1984).

summary judgment against plaintiff on his claim for tortious interference with the employment contract between the plaintiff and CDC. *Id.*

 *Alfano,* therefore, stands for the proposition that where a plaintiff is "prevented" from performing a preexisting contract because he voluntarily terminated it in order to enter into and enjoy the benefits of another contract with a third party, the plaintiff has no claim against that third party for tortious interference with the prior contract. In the case *sub judice,* the record clearly demonstrates that Copycomm ended what its expert witness Lawrence Redler described as a prospective "business opportunity" with MeterLogic so it could enter into a different agreement involving the same assets with another company, CMS. Assuming, without deciding, that Mr. Redler's testimony concerning Copycomm's potential lost profits from its contract with MeterLogic was sufficient to establish the existence and amount of those profits with reasonable certainty as required by Missouri law,[19] *Alfano* precludes any recovery from KLT on a § 766A theory. Moreover, under the circumstances presented in this case, to hold otherwise would make KLT the insurer of Copycomm's anticipated breach or termination of its contract with MeterLogic. As the Court of Appeals for the Seventh Circuit observed in *Stop–N–Go of Madison, Inc. v. Uno–Ven Co.,* 184 F.3d 672, 680 (7th Cir.1999):

> In other words, it would allow a plaintiff [suing under § 766A] to accept the more favorable terms offered by the defendant, but then hold the defendant liable if things do not turn out as planned. While the parties—both sophisticated and experienced businesses—were free to arrange this by contract, we are reluctant to reach such a result through tort law.

The court in *Stop–N–Go* went on to note that it was particularly hesitant to impose tort liability in light of the fact that the plaintiff, like Copycomm here, could point to no case authority supporting such a result. *Id.* For these reasons, which were presented in KLT's motion for directed verdict on Copycomm's claim against KLT for tortious interference with the Copycomm–MeterLogic contract under § 766A, we hold that the trial court properly granted the motion.

### *Conclusion*

The trial court properly directed a verdict against Copycomm on its § 766A-based claim for tortious interference with contract. The trial court erred, however, in failing to sustain KLT's motion for judgment notwithstanding the verdict. The award in favor of Copycomm is therefore vacated, and the judgment against KLT is reversed and remanded to the trial court for its entry of a judgment in favor of KLT.

All concur.

19. Anticipated profits of a commercial business are generally " 'too uncertain and dependent upon changing circumstances to warrant a judgment for their recovery.' " *Anuhco, Inc. v. Westinghouse Credit Corp.,* 883 S.W.2d 910, 923 (Mo.App. W.D.1994) (quoting *Brown v. McIBS, Inc.,* 722 S.W.2d 337, 341 (Mo.App. E.D.1986)). "The only exception to the general rule is where the anticipated profits are made certain by actual facts, 'with present data for a rational estimate of their amount.' " *Gesellschaft Fur Geratebau v. GFG Am. Gas Detection, Ltd.,* 967 S.W.2d 144, 147 (Mo.App. E.D.1998) (quoting *Orchard Container Corp. v. Orchard,* 601 S.W.2d 299, 305 (Mo.App. E.D.1980)). "[T]he evidence of lost profits must be sufficiently definite and certain so as to allow a reasonably accurate estimate of the loss without resorting to speculation." *Brown,* 722 S.W.2d at 341.